**UNION PLANTERS CORPORATION and Union Planters National Bank of Memphis, Plaintiffs-Appellees,**

v.

**Joseph P. HARWELL, Defendant,**

**Fidelity & Deposit Company of Maryland and United States Fidelity and Guaranty Company, Defendants-Appellants.**

Court of Appeals of Tennessee, Western Section.

Sept. 19, 1978.

Certiorari Denied by Supreme Court Feb. 26, 1979.

G. Wynn Smith, Jr., Robert M. Johnson, Mary L. Wolff, Patrick M. Ardis, of Canada, Russell & Turner, Memphis, for plaintiffs-appellees.

Fred P. Wilson, Alan R. Strain, John W. Leach, of Nelson, Norvell, Wilson, McRae, Ivy & Sevier, Memphis, James E. Clark, of London, Yancey, Clark & Allen, Birmingham, Ala., for defendants-appellants.

NEARN, Judge.

Union Planters National Bank filed suit against its former employee, Joseph P. Harwell, and his surety bondsmen, Fidelity and Deposit Company of Maryland and United States Fidelity and Guaranty Company, alleging that Harwell, while in plaintiff's employment, had, by means of embezzlement and by fraudulent conduct in the making of loans to certain customers, caused a substantial loss to plaintiff. A judgment was sought against Harwell for the amount of the loss and against the sureties for the amount owed under the terms of the respective surety bond agreements.

In his answer, Harwell admitted liability for amounts embezzled, but denied any other fraudulent conduct and denied any liability for any amounts sought by plaintiff other than those embezzled.

The bonding companies denied any liability under any theory.

Subsequently, Harwell confessed judgment to the full amount claimed by the bank of $8,418,670.72.

The issues between the bank and the bonding companies were tried to a jury by means of specific interrogatories submitted to that body for their answer. A total of 45 special fact issues were submitted, plus an additional general. verdict query as to whether the jurors found the issues joined in favor of the plaintiff or defendants. The cumulative upshot of the jury answers was an award in favor of the bank against the bonding companies in the amount of $4,522,416.79. At the hearings on the motions for new trial the Trial Judge remitted that amount by the sum of $60,378.46.

Both the bank and the bonding companies have appealed.

Defendant bondsmen have filed seven Assignments of Error with the Court. Five are addressed to the charge. One is a complaint of an evidentiary nature and the last charges that the answers of the jury to the special interrogatories are inconsistent as to each other, as well as to the general verdict.

Plaintiff bank charges the Court with error in granting a remittitur.

We will first consider the defendants' Assignments of Error.

The defendants first fault the Trial Judge for charging the jury that the burden of proof was upon the defendant bonding companies to show that plaintiff had failed to comply with the policy provisions requiring timely notice of loss. Appellant argues that the notice provision of the bond is a "condition precedent" to recovery and, therefore, the burden was on plaintiff to prove same; not defendants. We are cited to the reported opinions found in *Phoenix Oil Co. v. Royal Ind. Co.*, 140 Tenn. 438, 205 S.W. 128, a 1918 case; *Reliance Ins. Co. v. Athena Cablevision Corp.*, 560 S.W.2d 617, a 1977 Tennessee case; and several cases in between in an attempt to support the argument.

■ The notice provision in question is: "At the earliest practicable moment after discovery of any loss hereunder the insured shall give the underwriter written notice thereof—." We hold that the Trial Judge did not misplace the burden of proof in his charge. First, the provision is not a condition precedent because it does not expressly provide that it is such; as did the provision in the *Phoenix Oil* case, supra. Second, in this case receipt of notice is admitted by defendants. They simply attack the quality of the notice and say it was not given at the "earliest practicable moment". Courts will not presume a notice given is faulty. The presumption would be to the contrary. If the defendants wanted to insist it was a faulty notice, then it was up to them to prove its defects to the satisfaction of the trier of the facts. We find nothing in the *Reliance* case, supra, or any between *Reliance* and *Phoenix* that are to the contrary. Additionally, in this case the attack on the notice is an affirmative defense which was affirmatively pleaded and, as such, the burden was on the pleader to prove same. Tennessee Rules of Civil Procedure, Rule 8.03. The Assignment of Error is overruled.

■ The second Assignment of Error faults the Trial Judge for charging the jury, (a) that a leave of absence relationship between an employer and employee presupposes the continuation of an employer-employee relationship and does not, *ipso facto*, terminate the relationship and (b) that the burden of proof was on the defendants to prove that Harwell did not possess the status of employee at the time of the defalcations in question. An understanding of our treatment of this Assignment of Error requires some elucidation of facts.

Harwell was one of the vice presidents of the plaintiff bank. He was a manager of one of the bank's largest branches. Harwell became interested in the Memphis music industry. He learned about the business and became acquainted with those involved in that business. As a consequence, some of the record houses in Memphis and individuals associated therewith came to him for financial advice and loan assistance. One of these houses was the now defunct Stax Records. In time, the bank relied upon Harwell as their music industry expert. Sizeable loan transactions were involved to record houses and affiliates. Primarily, these loans were handled by Harwell. He authorized loans for Stax Records from Union Planters Bank in return for which he received cash payments to himself from Stax. To Harwell—The "Memphis Sound" became the source of pleasant and lucrative vibrations. In addition, in the early sixties Harwell began to set up fictitious accounts, without the involvement of Stax, and made loans to them and directly embezzled the money.

In November 1973 Harwell discussed with his superior in the bank, the idea of taking a leave of absence for six months to work on a "Memphis Music" show for national television and to develop a personal business called "Action for Ideas". The business was to function as a financial advisor to the music industry. After its establishment Harwell was to resume his duties with the bank. The bank was of the opinion that Harwell's leave of absence would benefit the bank, as such new enterprise would increase the music loan business. At that

time the bank thought such business a profitable source of income, rather than the deliquium of assets that it was. During this leave of absence Harwell was to draw no salary from the bank, would be relieved of his day to day duties, but his fringe benefits were to remain intact. During the leave of absence Harwell was to continue to advise the bank regarding music industry matters and to assist with renewals and repayments of music industry loans.

Harwell commenced his leave of absence beginning January 1, 1974. In April, 1974, Harwell submitted his resignation from the bank, effective April 30, 1974. From January 1, 1974, to April 30, 1974, Harwell "assisted" the bank in loan matters as aforesaid and during that period the bank renewed some music loans based on false and fraudulent information furnished by Harwell.

It is a position of the defendants that they are not liable for any of the fraudulent loan transactions made by the bank from January 1, 1974, to April 30, 1974, because Harwell was not an "employee" during that period of time. The fidelity bonds predicate liability on the condition that the loss be caused by an "employee". For this reason defendants feel aggrieved by that portion of the Court's charge which instructed the jury that a leave of absence does not constitute a termination of employment.

We are of the opinion that the Court did not err in this portion of its charge. "To be fired", "to quit", "to be sacked", "to terminate employment", are all general terms having the usually clear connotation of a complete severance of the employer-employee relationship. A "leave of absence" is, by the ordinary meaning of the words, something less than a complete severance or termination of that relationship. Its true meaning is a permission to be absent from duty. Therefore, it presumes a continuing relationship. If one is terminated no permission is needed to be absent. In fact, an attempted resumption of duty after termination could be a trespass. Since, in this case, it is undisputed that Harwell was on a "leave of absence" during a part of the time

in question, it is also logically undisputed that a presumption must arise that employer-employee relationship was not terminated during this period and defendants had the burden of overcoming the presumption. The complained of portions of the Trial Judge's charge are:

"There is a distinction between temporary suspension, leave of absence and termination of employment.

\* \* \* \* \* \*

"The defendant surety or insuror has the burden of proving any affirmative defenses. Thus, in order to rely on fraudulent representation as a defense, failure to notify in time, failure to discover loss, are all affirmative defenses, as well as termination of employment, fraud and concealment, misrepresentation, and the burden of proof on these affirmative defenses is on the defendant."

\* \* \* \* \* \*

"The relationship of employer and employee may continue to exist although the employee is on leave of absence. In fact, by its very nature, a leave of absence presupposes the continuation of the employer-employee relationship and, therefore, a leave of absence does not constitute a termination of employment."

We see no error there and accordingly overrule the Assignment of Error.

The third Assignment of Error is that the Trial Judge erred in charging the jury on the doctrine of *contra proferentem.*

He erred; but it was harmless.

The error of the Trial Judge was not, as argued by counsel for appellant, in charging on the doctrine of *contra proferentem* in the Court's effort to assist the jury in arriving at a proper legal interpretation or construction of the contract. The error was in submitting the bond contracts to the jury for construction and interpretation of the legal meaning thereof. In part the Court's charge in this regard is as follows:

"Since this is an insurance contract, drawn by the surety company, it will be strictly construed against them. The contract will be construed as an insurance

contract, and the reason for that is that the company is in the business for a consideration, taking risks of this kind.

"Being a contract of indemnity against loss, the contracts would be liberally construed in favor of the object sought to be attained."

■ The interpretation or construction of contracts is a judicial function; not one for the jury. The duty of the Court was for the Court to instruct the jury as to the legal effect and meaning of the contract; then, instruct the jury as to the disputed facts and the alternative results that will follow depending upon the facts as the jury may find; then, instruct them to find the facts as they may choose and return the necessary resulting verdict depending upon which state of facts they find existent.

■ Additionally, insurance contracts are not strictly construed against the insuror. They are construed just as any other contract is construed, that is, by its plain meaning with no application of strictness in favor of either party, *unless* an ambiguity is found. When an ambiguity is found, it will be resolved against the drafter of the instrument, but, the existence of an ambiguity in a written contract and its resolution are for a judge, not a jury. *Louisville & N. R. Co. v. Wynn* (1890) 88 Tenn. 320, 14 S.W. 311, *Walker v. Tennessee Farmers Mut. Ins. Co.* (1977 Tenn.App., E.S.) 568 S.W.2d 103.

■ We are unable to find in this record that any ambiguity in the bond was pleaded, proved, or even determined by the Trial Court. We have examined the bonds and we find nothing ambiguous about them. The parties hereto confuse ambiguous terms with ambiguous facts. Whether or not Harwell was an employee in the ordinary sense of the word was a matter of fact to be determined by the jury under the facts presented. The jury, by their answer to an interrogatory, determined that he was. They then had but to apply that fact to the contract which provided indemnification in the event of defalcation of "employees".

We say the error as assigned was harmless because, we have, without construing the contract against the insuror, but construing it ordinarily and without being strict or lenient to either side, and applying the external facts as found by the jury, reached the same construction of the contracts of indemnity as did the jury. Evidently, the Trial Judge also reached the same result, as he approved the jury findings.

The Assignment of Error is overruled.

■ The fourth Assignment of Error is two pronged. It first faults a portion of the charge as given and secondly, complains of the failure of the Trial Judge to charge a certain principle of law. The first prong of this Assignment of Error is not contained in the motion for a new trial and will, therefore, not be considered. Tennessee Court of Appeals Rule 12(6); *Provence v. Williams* (1970 E.S.) 62 Tenn.App. 371, 462 S.W.2d 885. As to the second prong of the attack, we have examined the charge and find that the Trial Court did, in substance, charge the principle which counsel for appellants claims is lacking and, moreover, counsel cannot now complain; as we find no special request to charge what counsel now says was omitted. Therefore, the second prong is unavailable on appeal. *Rule v. Empire Gas Corp.* (1978 Tenn.) 563 S.W.2d 551.

The Assignment of Error is overruled.

As before noted, Harwell confessed judgment against himself and admitted all allegations of fraud and embezzlement against him. Harwell did not testify; but his confession of judgment was made known to the jury. The fifth Assignment of Error complains of that portion of the Court's charge which instructed the jury to the effect that such confession made out a *prima facie* case as between the bank and its bondsmen of dishonest conduct and breach of the bond and raised a presumption which requires rebuttal that Harwell's bond had been breached. The gravamen of the Assignment is that even if such proof constitutes a *prima facie* showing of dishonest conduct and breach of the bond it does not give rise to a presumption which must prevail absent

rebuttal proof as was instructed by the Trial Judge.

■ We are aware that reams of paper have been consumed in scholarly opinions and dissertations in efforts to properly distinguish and explain the meaning and effect of a *"prima facie"* case in relation to the *"quantum* and quality" of proof required, and "presumptions rebuttable", "presumptions unrebuttable" and "inferences" arising therefrom and "inferences" themselves. We will not attempt to bring together and explain these various views, primarily because we do not believe we can. As we understand it, a *prima facie* case is made out when some credible proof (sometimes supplied by law, e. g., the inference obtainable under *res ipsa loquitur*) is presented on the issues required to be offered in evidence by a plaintiff for a plaintiff's recovery. When such is done, the defendant may go forward with the proof if he elects, or he may elect not to, and have the jury determine the credibility and sufficiency of plaintiff's proof without any contra proof from the defendant. The making out of a *prima facie* case is simply tantamount to a judgment *in posse.* Whether it becomes a judgment *in esse* is at the jury's option.

Therefore, so much of the charge that, in effect, states that a *prima facie* case entitles the party relying upon same to prevail in absence of evidence to the contrary is erroneous.

Again, however, we find this error to be harmless. Section 27–117 T.C.A. was enacted for just such instances as this, that is, where error was committed, but could have no effect on the outcome of the case. Much of appellants' brief on this point is concerned with the law and legal principles regarding presumptions and their effect. However, all law and all legal principles exist but for one purpose, and that is to be applied to proven applicable facts. Facts cannot be ignored, as they are the true heirs of legal principles. As to Harwell's dishonesty and breach of the bond by means of embezzlement, there is absolutely no doubt. It is proved by independent written

evidence, as well as Harwell's own later admission by confession of judgment. While no evidence was produced by anyone to counter the proof of embezzlement and the Court erroneously charged the jury that a presumption arose which required rebuttal proof, the jury would have to have been out of its collective mind, with or without aid of a presumption, to find other than that Harwell was guilty of embezzlement.

■ As to the losses incurred by the bank as the result of Harwell's fraudulent conduct, proof was presented by the bonding companies in an attempt to show that the bonding companies were not liable for such losses and that there was no breach of the bond during that period. While admittedly the Court charged that a presumption requiring rebuttal existed in favor of plaintiff's contention, the Court also charged the jury that once "contrary evidence is offered, however, the presumption disappears." We must presume juries follow charges or error in a charge would be no ground for reversal. This being so, the presumption favorable to appellee, which appellants complain of, disappeared when defendants adduced contrary proof. Therefore, as to the losses incurred during the "leave of absence" the error in the charge was corrected by the later portion of the charge, coupled with the contrary proof adduced by the defendants.

The fourth Assignment of Error is overruled.

■ One of plaintiff's witnesses was purported to have made a racial slur. Counsel for appellants sought to have such read into the record. Whether or not the witness made such statement has absolutely nothing to do with the issues joined between the parties. It was attempted to be introduced in a so-called effort to impeach the witness, as he denied having made such slurs. In rejecting the evidence the Trial Court stated:

"Unfortunately, in the zeal for advocacy, we use race as a 'red herring' and I am not going to permit that in this court, and the first lawyer that does it is going

to be fined for contempt of court. Justice is color blind. I want to try this case on the fact that we are all persons." Previous to those remarks the Court had stated:

"Let me say this, gentlemen: The court sometimes has to preserve the record for itself and I don't want this to go out publicly, but I want this record to show there are four people of black skin on this jury, because I have made previous rulings and I think the appellate court ought to know the atmosphere and flavor of a lawsuit."

We believe the attempted injection of the completely incompetent and immaterial "evidence" was entirely unwarranted and the Assignment of Error is overruled.

The final Assignment of Error of the defendants complains of alleged joint and several inconsistencies between the general verdict and the individual answers of the jury. We do not find any inconsistency.

The argument of counsel for appellants is that by answer to the various separate interrogatories it must be inescapably concluded that all losses to the bank occurred prior to April 30, 1974. (The date of Harwell's resignation.) Yet, the jury answered "yes" to interrogatory 29 which was: "Did the Bank, with actual knowledge of Harwell's fraud or dishonesty, approve and ratify any of the loans or overdrafts upon which the Bank sustained a loss through Harwell's fraud or dishonesty?" It is, therefore, insisted that the jury award must contain amounts for losses incurred by the bank with knowledge of Harwell's dishonesty. The major premise of the argument is faulty. Correctly stated it ought to be that the answer to the various separate interrogatories impels one to the conclusion that all losses to the bank *for which Harwell was responsible* occurred prior to April 30, 1974. When such is the premise there is absolutely no inconsistency found. The answer given to question 29(a) fixed the amount of loss ratified and approved by the bank with actual knowledge of Harwell's fraud or dishonesty at $24,527.08. The proof shows that the bank was seeking indemnification

for losses incurred on loans made in October and December 1974 totalling $24,527.08 under the theory that they had to renew these loans as a part of a reasonable collection effort to cut their losses on these two loans originally made by Harwell. The jury simply would not buy that theory and it appears to us that these answers are all perfectly consistent and not the least inconsistent.

The final Assignment of Error of the defendants is overruled.

We now consider the bank's Assignment of Error.

The Trial Judge granted a three category remittitur of $60,378.46 but failed to grant an additur of $159,338.65 requested by plaintiff. The bank complains of both actions.

■ The defendants' insuring agreement contains a $25,000 deductible provision. It is evident, and no one disputes the fact, that the jury did not consider the matter of the deductible provision in fixing the amount of the bank's loss. The bank complains that the Trial Judge could not grant a remittitur of $25,000 based on the deductible provision of the policy, as the defendants failed to plead the provision as a partial defense or otherwise mention it in any way prior to filing their motion for a new trial.

The bank sued the defendants for their liability under the policy. The plaintiff made the policy an exhibit to the complaint; it was introduced into evidence and recovery was sought based thereon. Plaintiff never asserted that the deductible clause was not applicable to the recovery. Therefore, defendants were never under any duty in those circumstances to allege the deductible clause as an affirmative defense as now insisted by plaintiff. The bank sued on a contract which contained a deductible provision. Why should a "defense" be required to be raised when there is no attack? The Assignment of Error is absolutely without merit and the Trial Judge did not err in applying the deductible clause.

Next, the bank charges the Court with error in double deducting from the judgment the sum of $24,527.08. We believe the complaint is meritorious. From our review of the record we find that the jury was asked by a series of interrogatories to fix the bank's dollar loss on various specified loans and overdrafts. Some of that series of interrogatories requested not only that the loss be fixed but also inquired if such losses were incurred prior to May 1, 1974. Some of those interrogatories as to specific accounts did not request a date as to when loss incurred. However, if all of the specified account losses for which no loss dates are requested of the jury are matched with exhibits in the record, it readily appears that all such undated accounts involved transactions made long before May 1974. Therefore, of necessity, all individual amounts fixed by the jury were for losses sustained prior to April 30, 1974, when the jury found Harwell terminated his employment. However, the jury was also requested by separate interrogatory (29) to fix the amount of the bank's loss on loans incurred after knowledge of Harwell's defalcation which was admitted to be September 1, 1974. The jury fixed that amount at $24,-527.08. Then the jurors were asked to fix the amount of the total judgment. They fixed that amount in the general verdict at $4,546,943.87. As the jury announced their answers and general verdict, the Court inquired if the jury had included the amount of $24,527.08 in the general verdict. A simple addition of the incurred losses found prior to May 1974 and those made after September 1974 shows that the jury had done so. The jurors immediately realized their error and the general verdict was altered and reduced by the foreman in open Court by the sum of $24,527.08 with the concurrence of all other jurors.

On motion for new trial the defendants insisted that they had not been given proper credit for the $24,527.08. This argument is based upon a misunderstanding of actions of the jury in reducing the general verdict to $4,522,416.79. It is argued by defendants that the intention of the jury was to find that the gross loss of the bank, including those losses suffered with *and* without knowledge of Harwell's defalcation was $4,522,416.79 and that the sum of $24,527.08 ought be deducted from that figure. Counsel for defendants was able to convince the Trial Judge that such was the case, for on motion for new trial the judgment was again reduced by $24,527.08. However, with the Bill of Exceptions showing the statement of the jurors, an adding machine, and the written answers to the interrogatories all available to us, we conclude that the Trial Judge did, in fact, give a double credit on the judgment for $24,527.08 and make a mechanical error in computation.

The bank also charges the Court with error in further reducing the judgment by the sum of $10,851.38. This dispute revolves about the jury's answer to a specific interrogatory regarding the "Alvertis Isbell" account. The jury fixed the amount of the bank's loss at $36,607.67. The defendants insisted that the record clearly shows that this was the result of a $10,851.38 arithmetical computation error and the Trial Court was correct in reducing the judgment by that amount.

In order to arrive at this conclusion it must be presumed that the jury based the amount of liability on the Isbell account by using the overdraft balance of the account of December 31, 1973, of $31,213.48 and then used the figure of $5,394.19 which was the amount by which the overdraft balance was reduced on April 30, 1974, and then assume that the jury erroneously added the $5,394.19 to the $31,213.48 instead of subtracting same. The Court is then asked to treat the $63.00 difference as the result of an inadvertent transposition of the figures by the jury and as *de minimis*.

We cannot assume that the jury used the overdraft balance of December 31, 1973, as a basis for liability. Such assumption would be based upon pure speculation. Even larger overdraft balances are shown by the record prior to April 30, 1974. Any of various figures could have been used by the jury as a basis for fixing the amount of liability; any of which would be in the

range of the proof and within the range of reasonableness. Therefore, such judgment amount should remain undisturbed. *Robert F. Smith, Commissioner, Tennessee Department of Transportation v. Madison Shelton and wife, Ollie Shelton*, Supreme Court Opinion filed July 31, 1978, marked "For Publication". The bank's Assignment of Error in this regard is sustained.

The bank also complains of the Court's failure to make additur to the judgment by the sum of $159,388.65 which sum, to our mind, is arrived at by bank's counsel by the same method as used by defendants' counsel in attempting to support the $10,851.38 reduction just previously disallowed.

What is sauce for the remittitur is sauce for the additur and for the same reason the $10,851.38 remittitur could not be approved, the sought after $159,388.65 additur will not be approved.

The result is that the judgment below is modified to the extent that it is increased by $35,378.46, but otherwise affirmed and the cause is remanded to the *Trial Court for* the enforcement of the judgment.

Costs of appeal are adjudged against the defendants and execution for same may issue from this Court if necessary.

MATHERNE and EWELL, JJ., concur.