IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 10, 2001 Session

## YOLANDA SOLOMON v. BRAD HAGER, ET AL.

**Appeal from the Chancery Court for Hamblen County**
**No. 97-248     Thomas R. Frierson, II, Chancellor**

---

**No. E2000-02586-COA-R3-CV**
**Filed December 27, 2001**

---

This lawsuit finds its genesis in the construction of a residence. The plaintiff, Yolanda Solomon, filed suit against Allstate Insurance Company[1], alleging breach of contract and seeking damages and a bad faith penalty for Allstate's failure to pay her claim under a builder's risk policy covering her under-construction residence. Solomon later amended her complaint to seek additional damages under the Tennessee Consumer Protection Act.[2] By way of a special verdict, the jury found (1) that the insurance policy provided coverage for Solomon's loss; (2) that Allstate had acted in bad faith in denying her claim; and (3) that Allstate had violated the Consumer Protection Act. As modified by the trial court, Allstate was ordered to pay $101,098, the full amount of the plaintiff's coverage less the deductible; a 25% bad faith penalty; $1,500 under the Consumer Protection Act; attorney's fees; discretionary costs; and prejudgment interest. Allstate appeals, challenging, among other things, the jury's finding of coverage, the assessment of the bad faith penalty, evidentiary and jury instruction rulings, and the amount of damages. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and HERSCHEL P. FRANKS, J., joined.

Christopher D. Heagerty, Knoxville, Tennessee, for the appellant, Allstate Insurance Company.

---

[1] Solomon also sued the builder of the residence, Brad Hager and Trevie Richard Oney, doing business as Hager Construction, for breach of contract and gross negligence. The jury found that the construction had not been performed in a workmanlike manner and awarded Solomon a judgment against the builder for compensatory and punitive damages, Consumer Protection Act damages, attorney's fees, and discretionary costs. The builder did not appeal.

[2] T.C.A. § 47-18-101 *et seq.* (1995 and Supp. 2000).

James M. Davis, Morristown, Tennessee, for the appellee, Yolanda Solomon.

## OPINION

### I. *Facts*

In November, 1996, Solomon entered into a verbal contract with Brad Hager and Trevie Richard Oney, doing business as Hager Construction, to build a house for a contract price of $55,000. On December 16, 1996, Solomon obtained a builder's risk policy from the defendant, Allstate Insurance Company. Solomon testified that Clarence Thompson, the Allstate agent who sold her the policy, advised her (1) that the policy was "to protect me"; and (2) that "if I have any complications with the structure while it's under construction, then the policy would pay for it and I wouldn't have to take any more money out of my pocket." The limit of coverage under the policy was $101,598. There was a deductible of $500.

When Hager Construction began excavating for the house's foundation, it discovered that the ground was full of rock and would require blasting before work on the house could proceed. It dynamited the site, but the resulting hole was larger than expected. The company gave Solomon the option of building a basement for an additional $10,000. Solomon agreed, and the construction proceeded.

On February 21, 1997, following several days of apparently heavy rains, the front wall of the basement fell. The plaintiff testified that when she arrived on the construction site[3], she saw that the roof was sagging and that the house was bowed in the middle. She immediately called Thompson, who told her, "Well, I'm sorry, but it sounds like it has been a flood, and Allstate does not cover floods." Unsatisfied with this response, Solomon called Thompson again the next day and asked him to come and look at the house. She testified as follows:

> I called Mr. [Brad] Hager and asked him if he would come and be there with me. He did come.
>
> The three of us discussed the collapse of the wall, and I asked Mr. Thompson if he – he came dressed in a suit, and I asked him if he had brought boots so he could go and look at the house.
>
> He said he didn't need to look at the house, he could see what he needed to see from the road. He stood in the road and looked at my house and said, "All three of us need to make an agreement that it was a flood that caused the damage, because Allstate is not going to pay this claim."

---

[3]The parties agree that the residence was still under construction at the time of the loss.

Solomon asked Thompson whether he had brought a camera in order to document the damage, but Thompson told her "there was no need to do that." Nevertheless, Solomon and Hager took photographs of the house. Thereafter, repair work and cleanup began on the site.

Solomon called the Allstate claims department and advised it that she was making a claim for the loss. A few days later, Mike Smith, an Allstate claims adjuster, contacted Solomon and made arrangements to visit the site, along with an engineer, to survey the damage. Eleven days after the failure of the wall, Smith visited the site alone. By that time, the new basement wall was near completion and the debris had been cleared. Smith obtained the photographs taken by Solomon and Hager and advised that he would consult with an engineer in order to determine the cause of the fall of the basement wall. After a week had passed without any word from Smith, Solomon attempted to contact him. After several days, she finally reached him, and he advised her "that the engineer said that the wall failed due to electrostatic pressure against that wall and that Allstate wouldn't pay for it." When she asked Thompson what electrostatic pressure was, he said he did not know.

Following her conversation with Smith, Solomon again contacted Thompson regarding coverage. Solomon insisted that the loss was covered under the policy. Thompson told her that he had contacted the Allstate home office and had been advised that "they're not going to pay." On June 25, 1997, Solomon went to Thompson's office. During the meeting that followed, Thompson called Smith, the claims adjuster who had visited the site some three months earlier. Over the telephone, Smith told Solomon, "I am formally telling you that I do – that we are not going to pay your policy."

On August 8, 1997, Solomon filed the instant action against Allstate and the builder. The complaint seeks $110,000 in compensatory damages, $110,000 in exemplary damages for gross negligence, a 25% penalty for Allstate's bad faith in denying her claim, and general relief. On December 6, 1999, Solomon filed a motion seeking to amend her complaint to allege that the defendants had violated the Consumer Protection Act. An order allowing the amendment was entered on February 9, 2000, the day the jury was impaneled and the trial started.

At trial, Solomon presented the testimony of two experts to support her theory that her loss was caused by a "collapse" and was covered under the policy. Max Cook, an engineer, testified that the basement wall had been built using a defective method of construction. He opined that the wall had not been built to withstand the "normal lateral earth pressure" of nine feet of backfill – the amount of backfill that had been placed against it – and that, given this amount of backfill, the wall should have been constructed using 12-inch block, reinforced with concrete and steel rebar. He opined that if the wall had been constructed in this manner, it would not have fallen.

Cook testified that the collapse of the wall had "severely damaged the whole house structure, both cosmetic[ally] and structurally." He noted that the truss plates in the floor joists had been severely stressed and weakened, resulting in a bouncy floor. The failure of the wall also had caused numerous cracks in the drywall throughout the house and had caused the exterior siding to buckle. Cook testified that the house

could be fixed, but it would probably cost more to fix it than to tear it down and start over. I don't see a practical way to fix these problems, because there's just so much damage that it would be so difficult to analyze the total scope of the damage there.

Every joint connection, every truss connection, every nail connection throughout the house would have to be checked, and that's cost prohibitive to do that.

Don Kimbrough, a builder and general contractor, was also a witness for Solomon. He agreed that the failure of the wall was caused by the failure to construct the wall with 12-inch block reinforced with steel and concrete rebar. Like Cook, Kimbrough testified that it would cost more to repair the house than to rebuild it. He opined that "to build it right, it would probably run about one hundred, one hundred forty thousand dollars."

Allstate defended on the theory that the plaintiff's loss was not covered because, according to Allstate, the wall fell as a result of several factors that were excluded under the policy. Allstate presented the testimony of Jerry Lambert, an engineer, who testified that the failure of the basement wall was caused by "dirt [that] had been piled up above [it] and slid down." He acknowledged, however, that the use of 8-inch block without reinforcements is an inadequate design for a wall that is required to support nine feet of backfill.

At the conclusion of all the proof, Solomon and Allstate both moved for directed verdicts, which motions were denied. Thereafter, the case was submitted to the jury. By way of a special verdict, the jury found that the builder breached its contract with Solomon by failing to perform the construction in a workmanlike manner and that it had committed unfair or deceptive acts in violation of the Consumer Protection Act. As to the builder, the jury awarded Solomon $115,000 in compensatory damages, plus either $150,000 in damages under the Consumer Protection Act or $200,000 in punitive damages, as well as prejudgment interest.

As to Allstate, the jury was asked the following: "With reference to construction of the first[4] basement wall, does the applicable policy of insurance by Defendant Allstate provide coverage for Plaintiff's claimed losses?" The jury responded in the affirmative and found that Allstate was responsible for $117,598 in damages. The jury further found that Allstate had failed to act in good faith when it denied Solomon's claim and that Allstate's bad faith resulted in additional expense, loss or injury to Solomon; accordingly, it awarded Solomon a 25% bad faith penalty. The jury further found that Allstate had violated the Consumer Protection Act and awarded Solomon $200,000 in damages under the Act. The jury also awarded Solomon prejudgment interest against Allstate.

---

[4]The evidence reflects that the *repaired* basement wall began to bulge inward shortly after its construction. The jury found that the policy did not provide coverage for any loss claimed in connection with the second wall. This finding has not been appealed.

Following the jury's verdict, Solomon filed a motion seeking an additional recovery under the Consumer Protection Act, including treble damages, attorney's fees, and discretionary costs. In a supplemental judgment entered August 11, 2000, the trial court found that Solomon was entitled to treble damages of $4,500 against the builder for what the court found to be its willful and knowing violation of the Consumer Protection Act. The trial court determined, however, that Solomon had failed to demonstrate that Allstate's violation of the Act was willful or knowing and thus declined to award treble damages as to it. The trial court held that Solomon is entitled to recover her attorney's fees of $14,781.25 and discretionary costs of $2,888.06 against the defendants, jointly and severally.

The defendants filed motions for a new trial. The trial court denied the motions but suggested a remittitur, which was accepted by the plaintiff. The trial court reduced the compensatory damages awarded to Solomon against Allstate to $101,098 and the damages awarded under the Tennessee Consumer Protection Act against all defendants to $1,500. The court approved the jury's assessment of a 25% bad faith penalty.[5]

## II. *The Insurance Policy*

The pertinent provisions of the builder's risk policy at issue in this case are as follows:

> *Coverage A*
> *Dwelling Protection*
>
> *Property We Cover Under Coverage A:*
> 1. **Your dwelling**,...
>
>               \*    \*    \*
>
> *Coverage B*
> *Other Structures Protection*
>
>               \*    \*    \*
>
> *Losses We Cover Under Coverages A and B:*
>
> **We** will cover sudden and accidental direct physical loss to property described in **Coverage A – Dwelling Protection**...except as limited or excluded in this policy.

---

[5]The trial court also suggested a remittitur of the compensatory damages awarded against the builder to $110,000, the amount requested by the plaintiff in her *ad damnum*. Upon the plaintiff's election, she was also awarded $200,000 in punitive damages in lieu of $4,500 in treble damages under the Consumer Protection Act.

*Losses We Do Not Cover Under Coverages A and B:*

**We** do not cover loss to the property described in **Coverage A – Dwelling Protection** or **Coverage B – Other Structures Protection** consisting of or caused by:

1.     Flood, including, but not limited to surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind.

\*    \*    \*

4.     Water or any other substance on or below the surface of the ground, regardless of its source. This includes water or any other substance which exerts pressure on, or flows, seeps or leaks through any part of the **residence premises**.

\*    \*    \*

5.     Earth movement of any type, including, but not limited to earthquake, volcanic eruption, lava flow, landslide, subsidence, mudflow, pressure, sinkhole, erosion, or the sinking, rising, shifting, creeping, expanding, bulging, cracking, settling or contracting of the earth.

This exclusion applies whether or not the earth movement is combined with water.

\*    \*    \*

12.    *Collapse, except as specifically provided in **Section I – Additional Protection** under item 11, "Collapse."*

\*    \*    \*

22.    Planning, Construction or Maintenance, meaning faulty, Inadequate or defective:
      a)   planning, zoning, development, surveying, siting;
      b)   design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
      c)   materials used in repair, construction, renovation or remodeling; or
      d)   maintenance;

of property whether on or off the **residence premises** by any person or organization.

23.    **We** do not cover loss to covered property described in **Coverage A – Dwelling Protection** or **Coverage B – Other Structures Protection** when:

a)   there are two or more causes of loss to the covered property; and

b)   the predominant cause(s) of loss is (are) excluded under **Losses We Do Not Cover**, items 1 through 22 above.

(Bold print in original; emphasis in "Collapse" provision added). In addition to the coverage provisions and exclusions set forth above, the policy provides additional terms of coverage in a section entitled "Additional Protection," which protections are alluded to in the "Collapse" exclusion set forth in the policy provisions quoted above. As pertinent here, the "Additional Protection" language is as follows:

### *Additional Protection*

\*   \*   \*

11.    **Collapse**
**We** will cover:

a)   the entire collapse of a covered **building structure**;

b)   the entire collapse of part of a covered **building structure**; and

c)   direct physical loss to covered property caused by (a) or (b) above.

For coverage to apply, the collapse of a **building structure** specified in (a) or (b) above must be a sudden and accidental direct physical loss caused by one or more of the following:

\*   \*   \*

f)   defective methods or materials used in construction, repair, remodeling or renovation, but only if the collapse occurs in the course of such construction, repair, remodeling or renovation.

(Bold print in original).

### III.  *Issues*

Allstate appeals, arguing, for various reasons, that the trial court erred (1) by not granting its motion for directed verdict and (2) by failing to grant its motion for a new trial.

### IV.  *Standard of Review*

A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. *Eaton v. McLain,* 891 S.W.2d 587, 590 (Tenn. 1994). In reviewing a trial court's denial of a motion for directed verdict, we must take the strongest legitimate view of the evidence favoring the opponent of the motion. *Id.*  Additionally, all reasonable inferences in favor of the opponent of the motion must be allowed, and all evidence contrary to the opponent's position must be disregarded. *Id.*

A motion for a new trial addressing factual issues requires the trial court to perform its function as a thirteenth juror. *See **Ridings v. Norfolk S. Ry. Co.,*** 894 S.W.2d 281, 288 (Tenn. Ct. App. 1994). This Court has described that function as follows:

> [i]f a trial court is called upon to act as a thirteenth juror following the filing of a motion for a new trial, the trial court must be independently satisfied with the verdict of the jury. In performing this function, the trial court must itself weigh the evidence heard by the jury. If after weighing the evidence, the trial court is satisfied with the verdict, it is that court's responsibility to approve the verdict; on the other hand, if it is not satisfied with the verdict after weighing the evidence, the trial court must grant a new trial. The trial court's performance of its function as thirteenth juror must be performed without regard to and without deference being shown to the result reached by the jury. As the thirteenth juror, the trial court acts as a jury unto itself in evaluating and weighing the evidence presented at the trial.

*Id.* at 288-89 (citations omitted).

The denial of a motion for new trial is a decision within the discretion of the trial court, and we will not disturb that decision absent an abuse of that discretion. *See **Mize v. Skeen,*** 468 S.W.2d 733, 736 (Tenn. Ct. App. 1971). In reviewing the trial court's decision, we do not reweigh the evidence and consider where the preponderance lies. *Id.* Rather, our duty is to determine whether the record contains material evidence to support the verdict. *See id.* In the process of searching for material evidence, we must disregard all evidence to the contrary, even though such evidence may have supported one or more of the defendant's theories at trial. *See **Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.,*** 691 S.W.2d 522, 526 (Tenn. 1985).

V. *Coverage*

Allstate first argues that the trial court erred in failing to grant it a directed verdict, or, at a minimum, a new trial, as to the issue of coverage. In so arguing, Allstate contends that there is no competent proof in the record that the failure of the wall was the type of collapse covered by the policy. Allstate argues that the basement wall collapsed as a result of several factors, including backfill pressure, movement of the soil, inadequate design, and faulty workmanship, any one of which, Allstate contends, is an excluded cause under the policy. Allstate also takes issue with evidentiary rulings, the trial court's charge to the jury and with the questions posed to the jury on the special verdict form.

A.

As a general rule, contracts of insurance are subject to the same rules of interpretation and construction as other contracts. *See McKimm v. Bell,* 790 S.W.2d 526, 527 (Tenn. 1990). Absent fraud or mistake, such contracts are interpreted as written, and their terms are given their plain and ordinary meaning. *Swanson v. Mid-South Title Ins. Corp.,* 692 S.W.2d 415, 419 (Tenn. Ct. App. 1984). If a term is susceptible to more than one reasonable meaning, the term is construed against the insurer and in favor of the insured. *Harrell v. Minnesota Mut. Life Ins. Co.,* 937 S.W.2d 809, 814 (Tenn. 1996). The interpretation of a contract presents a question of law for the court. *Union Planters Corp. v. Harwell*, 578 S.W.2d 87, 92 (Tenn. Ct. App. 1978).

While the policy in the instant case expressly and comprehensively addresses a loss due to "collapse," it does not define that term. However, the ordinary meaning of this word is "[t]he act of falling down or inward, as from loss of supports." *Webster's II New Riverside University Dictionary* 280 (1994). In the instant case, there is material evidence to support a finding that the plaintiff's loss was caused by a "collapse" – as that word is commonly defined – of the basement wall. While the parties dispute which factors contributed to the collapse itself, we find that it is clear beyond any doubt that the plaintiff's loss in this case was precipitated by the collapse of the basement wall. We therefore hold, as a matter of law, that the provisions of the policy relative to collapse are implicated in the instant case, and it is to these provisions that we look to determine whether the plaintiff's loss is covered.

The plaintiff's policy provides that a loss caused by a collapse is excluded unless the collapse meets the criteria set forth in the *coverage* provisions listed under "Additional Protection." Thus, a collapse is *covered* if it was "sudden and accidental" and was caused by, among other things, "defective methods or materials used in construction."

There is material evidence in the record to support a finding that the basement wall collapsed as a result of a defective method of construction. Max Cook testified that the amount of backfill against the basement wall required that it be constructed with 12-inch block reinforced with concrete and steel rebar. He opined that the construction of such a wall with 8-inch concrete block without such reinforcements constitutes a defective method of construction. Don Kimbrough testified to the

-9-

same effect, stating that the wall should have been constructed with 12-inch reinforced block. Based upon the testimony of these experts, we find that there is material evidence to support a finding that a "defective method[]...[was] used in construction" and that this defective method resulted in a collapse, which collapse was the cause of the plaintiff's loss. It therefore follows that the *coverage* provisions pertaining to a collapse apply, and the plaintiff's loss is a covered event.

Allstate strenuously argues that we should focus upon certain exclusions other than the "collapse" exclusion, *i.e.*, exclusion number 12, particularly the provisions that exclude losses caused by earth movement, water pressure, and inadequate or defective design or workmanship. The problem with this approach is twofold. First, Allstate insists that every exclusion in the policy should be considered and a determination made as to whether the collapse that occurred was a result of *any* excluded cause. We cannot agree with this analysis in this case. Each exclusion in an insurance policy operates independently of the other and should be read separately. ***Standard Fire Ins. Co. v. Chester-O'Donley & Assocs., Inc.,*** 972 S.W.2d 1, 8 (Tenn. Ct. App. 1998). While exclusions should not "be construed so narrowly as to defeat their intended purpose," they also cannot be construed too broadly in favor of the insurer. ***Id.*** We think the proper analysis is the approach adopted by the trial court in the instant case. First, it must be determined whether a collapse occurred. Second, the cause of the collapse must be ascertained. If the collapse was caused by any of the factors listed in the *coverage* provisions applicable to a "collapse" – such as "defective methods or materials used in construction" – the collapse is covered. If the collapse was the result of a factor other than those listed in the coverage provisions pertaining to collapse, the collapse would not be covered. The other exclusions stated in the policy simply are not implicated once a determination has been made that a collapse has occurred, a loss-causing condition which is, at the same time, addressed in an exclusion provision as well as a coverage provision. In other words, the policy states that collapse is excluded unless it is covered under the expressed conditions *applying exclusively* to an incident of collapse.

The second problem with Allstate's approach is that the exclusions it relies upon are in direct conflict with the coverage provided by the policy for certain collapses. The policy provides that a loss is covered if it is the result of a collapse caused by, among other things, "defective methods or materials used in construction, repair, remodeling or renovation," if the collapse occurs in the course of construction, repair, remodeling or renovation. One of the exclusions relied upon by Allstate, however, excludes losses caused by, among other things, inadequate or defective "materials used in repair, construction, renovation or remodeling." This conflicting language leads us to conclude that the exclusions relied upon by Allstate do not apply in the event of a collapse. Allstate will not be permitted to *specifically* provide coverage for an event and then take it away in the *general* language of the policy.

We have determined that there was a collapse within the meaning of the policy and that there is material evidence to support a finding that the collapse was caused by a defective method of construction. Accordingly, we hold that the policy covers the plaintiff's loss. Allstate's argument that other exclusions in the policy operate to exclude that coverage is without merit.

B.

We now turn to Allstate's arguments regarding the trial court's charge to the jury. In reviewing a jury charge, we consider the charge as a whole to determine whether prejudicial error has been committed. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 446 (Tenn. 1992); *In re Estate of Elam,* 738 S.W.2d 169, 174 (Tenn. 1987). The challenged portion of the charge must be viewed in context. *Estate of Elam,* 738 S.W.2d at 174. "The charge will not be invalidated as long as it fairly defines the legal issues involved in the case and does not mislead the jury." *Otis,* 850 S.W.2d at 446; *Grissom v. Metropolitan Gov't of Nashville,* 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991). Accordingly, jury instructions are not measured against a standard of perfection. *Id.*

First, Allstate argues that the trial court erred in failing to instruct the jury as to the legal meaning of the term "defective methods...used in construction" as used in the policy and that by failing to so, the trial court erroneously allowed the jury to interpret the contract. Allstate argues that the trial court should have charged the jury with the following instruction:

> In order to find that a collapse resulted from a "method in construction," you must find that improper methods or procedures were used in the actual laying of the block wall. "Method in construction" does not include design defects. *Hathaway v. Cedarburg Mut. Ins. Co.,* 503 N.W.2d 5 (Wis. App. 1993).

A trial court may decline to give a requested instruction if (1) it is not supported by the evidence; (2) the substance of the instruction is already addressed in the charge; or (3) it is an incorrect statement of the law or is otherwise incomplete. *Ingram v. Earthman,* 993 S.W.2d 611, 636 (Tenn. Ct. App. 1998), *perm. app. denied* March 22, 1999, *cert. denied* 528 U.S. 986 (1999). In the instant case, the trial court refused to charge the jury as requested by Allstate, noting "I have not been able to determine that is the law in the State of Tennessee, and by virtue of that, I'm not going to charge the jury with regard to Wisconsin law." We find no error in the trial court's decision. Like the trial court, we have not found any authority to indicate that the requested charge is an accurate statement of the law in Tennessee. Indeed, if we look to the plain and ordinary meaning of the terms "method" and "design," we find that these words are very similar in meaning. "Method" is commonly defined as "[a] manner or means of procedure,...a systematic and regular way of accomplishing a given task." *Webster's II New Riverside University Dictionary* 747 (1994). "Design" is commonly defined as "[i]nvention and disposition of the forms, parts, or details of something according to a plan" and as "a *method* for making, doing, or accomplishing," such as a "design" for a building. *Id.* at 367 (emphasis added). The trial court did not err in refusing to give this particular instruction to the jury.

Allstate complains that the trial court erred in giving the following instruction:

> You must first determine whether plaintiff has carried her burden of proof that the loss of which she complains resulted in substantial part

-11-

from collapse as defined in the policy. If your answer is yes, you should then determine the extent, if any, of plaintiff's recovery from...the defendant Allstate. If your answer is no, you must then consider each of the exclusions upon which defendant Allstate relies to determine if coverage is not provided because of an excluded risk.

We find no error in this instruction. The trial court correctly instructed the jury that if they found that the plaintiff's loss was due in substantial part to a "collapse" as defined in the coverage provisions of the policy, *i.e.*, a sudden and accidental collapse resulting from defective methods or materials used in the construction of the residence, then the loss would be covered. The instruction also correctly advises the jury that if a covered collapse is found, the other exclusions set forth in the policy would not apply, as those exclusions would be implicated only in the event that a collapse had not occurred. As discussed previously, we find this to be a correct interpretation of the insurance policy before us. Allstate's argument is without merit.

Next, Allstate argues that the trial court erred in instructing the jury as follows:

Remember as an overriding rule of law, there should be coverage where a nonexcluded cause, i.e. collapse, as defined in this policy is a substantial factor in producing damage or injury even though an excluded cause may have contributed in some form to the ultimate result and standing alone would have properly invoked the exclusion contained in the policy.

Allstate argues that this charge is an erroneous application of the "concurrent causation" theory set forth in cases such as *Allstate Ins. Co. v. Watts,* 811 S.W.2d 883 (Tenn. 1991). It contends that the principle enunciated in the *Watts* case is not applicable to the instant case because it is contrary to the following express provision of the policy:

**We** do not cover loss to covered property described in **Coverage A – Dwelling Protection** or **Coverage B – Other Structures Protection** when:
a) there are two or more causes of loss to the covered property; and
b) the predominant cause(s) of loss is (are) excluded under **Losses We Do Not Cover**, items 1 through 22 above.

(Emphasis in original). The problem with Allstate's argument is simply this: the provisions of the policy relied upon by the insurance company to support its argument are not implicated by the facts of this case. This is because the cause of the loss – a collapse – is *not* excluded under "Losses We Do Not Cover," as previously explained in this opinion. Since the policy provisions relied upon by the insurance company are not implicated by the facts of this case, the language of these provisions

-12-

is immaterial to the resolution of this controversy.  We therefore find Allstate's argument as to this issue to be without merit.

## C.

Allstate next takes issue with the special verdict form.  The jury was asked, "With reference to construction of the first basement wall, does the applicable policy of insurance by Defendant Allstate provide coverage for Plaintiff's claimed losses?"  Allstate argues that the trial court committed reversible error in allowing the jury to determine the legal question of whether coverage exists and contends that the jury should have been presented with inquiries regarding each possible cause of the collapse proven at trial.

While it is true that the interpretation and construction of insurance contracts are for the court and not the jury, *see **Union Planters Corp. v. Harwell,*** 578 S.W.2d 87, 92 (Tenn. Ct. App. 1978), we do not agree with Allstate that the trial court committed *reversible* error in this case by asking the jury whether there was coverage for the plaintiff's loss.  Such error will not afford a ground for reversal "if it should appear that the jury had nevertheless construed the writing correctly." ***Louisville & N. R. Co. v. Wynn,*** 88 Tenn. 320, 333, 14 S.W. 311, 314 (1890).  In order to find that the plaintiff's loss was covered under the particular facts of this case, the jury had to find that a collapse occurred as a result of a defective method used in the construction of the basement wall; that is the coverage provision implicated by the plaintiff's theory of recovery in this case.  Upon reviewing the evidence, we have determined that there is material evidence to support a finding that the facts bring this case within the coverage of the policy, as that coverage has been found by this Court as a matter of law.  This issue if found adverse to Allstate.

## VI. *Award of Damages*

Allstate next argues that the award of damages against Allstate it not supported by the law or the evidence.  It contends that the award "is totally without foundation" and that the only proof of damage resulting from the collapse of the wall was $3,244.84, the amount that the plaintiff testified that she spent on repairing the wall.  Allstate further argues that the trial court erred in admitting the testimony of the plaintiff's two experts because, so the argument goes, the plaintiff failed to properly disclose the subject matter and factual basis for their opinion testimony before trial.  Allstate also contends that the award to the plaintiff constitutes a double recovery in excess of her *ad damnum*.  We will address each of these arguments in turn.

## A.

We begin by addressing the award of damages.  There is material evidence in this record to support the award of the full amount of the insurance policy.  Solomon testified that she spent $111,570 in building her house.  The evidence reflects that when the basement wall collapsed, the structural integrity of the house was weakened.  The collapse caused the drywall in the house to crack and the siding on the exterior to buckle.  There is also evidence to suggest that the collapse has

contributed to the inward bulging of the other basement walls. The plaintiff's experts testified that, given the amount of damage from the collapse, it would cost more to repair the home than to tear it down and rebuild it. There is material evidence to support the plaintiff's award.

B.

Next, Allstate argues that the trial court erred in failing to exclude the testimony of Solomon's experts, Max Cook and Don Kimbrough. It argues that Solomon failed to supplement her responses to Allstate's interrogatories to notify Allstate that Cook "changed and added opinions after his discovery deposition." Allstate further complains that Kimbrough had not been identified prior to trial as an expert witness.

Under the rules of discovery, a party has the duty to seasonably supplement his or her responses to a request for the identity of any expert witnesses expected to be called at trial and the substance of their opinions. *See* Tenn. R. Civ. P. 26.05. Although the rules do not provide a sanction for a party's failure to seasonably supplement his or her responses, trial judges have the inherent power to take corrective action against a party for abuse of the discovery process. *Lyle v. Exxon Corp.,* 746 S.W.2d 694, 699 (Tenn. 1988). In some cases, the trial judge may deem that the exclusion of the undisclosed expert's testimony is the appropriate sanction, *see Ammons v. Bonilla,* 886 S.W.2d 239, 243 (Tenn. Ct. App. 1994), although other, less severe sanctions may be appropriate where the failure to disclose is not knowing and deliberate. *Lyle,* 746 S.W.2d at 699. We will not disturb the trial court's determination of the appropriate sanction to be imposed unless the court commits an abuse of its discretion. *See id.*

Allstate argues that Cook changed his opinion prior to trial. In his April 16, 1998, report, Cook states that he could not determine whether the bulging of the other basement walls was caused by defects in their construction or by the collapse of the front wall. At trial, he testified that, upon looking at the problem "a little closer," he had determined that the bulging was a result of a combination of these factors.

The trial court did not abuse its discretion in allowing Cook to testify. It does not appear that Cook significantly changed the substance of his testimony so as to require a supplement to his report. Moreover, there is nothing to indicate that the plaintiff deliberately and knowingly withheld such information from the defense. Allstate's argument is without merit.

We further find that the trial court did not abuse its discretion in allowing Kimbrough to testify. In declining to exclude his testimony, the trial court noted that some ten months prior to trial, Solomon's counsel sent correspondence to Allstate's counsel, identifying Kimbrough as a builder and contractor, and indicating that he would testify at trial. The court also noted that Kimbrough had been listed as a witness on the plaintiff's witness list and that photographs taken by him had been listed on the plaintiff's exhibit list. Despite this notification, the trial court noted, Allstate failed to engage in any discovery of this witness. Given these circumstances, we do not find that the trial court abused its discretion in allowing Kimbrough to testify. Moreover, given that the substance of

Kimbrough's testimony is almost identical to that given by Cook, we find that even if the failure to exclude Kimbrough's testimony was in error, such error was not one that more probably than not affected the verdict. *See* Tenn. R. App. P. 36(b).

## C.

Allstate also contends that the plaintiff has been awarded a double recovery, and that the award exceeds the plaintiff's *ad damnum*. We disagree. The plaintiff was ultimately awarded $110,000 in compensatory damages against the builder and $101,098 against Allstate. Pursuant to the policy, Allstate has the right to seek subrogation against Hager and Oney for the amount it is required to pay. Therefore, Allstate's argument that the plaintiff was awarded a double recovery in excess of her *ad damnum* is without merit.

## VII. *Bad Faith Penalty*

Next, Allstate challenges the assessment of a 25% bad faith penalty pursuant to T.C.A. § 56-7-105, which provides, in pertinent part, as follows:

> The insurance companies of this state...in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest thereon, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that such failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided further, that such additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

T.C.A. § 56-7-105(a) (2000).

Before a plaintiff may recover a penalty pursuant to this provision,

> (1) the policy of insurance must, by its terms, have become due and payable, (2) a formal demand for payment must have been made, (3) the insured must have waited 60 days after making his demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days), and (4) the refusal to pay must not have been in good faith.

-15-

***Palmer v. Nationwide Mut. Fire Ins. Co.,*** 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986); ***Walker v. Tennessee Farmers Mut. Ins. Co.,*** 568 S.W.2d 103, 106 (Tenn. Ct. App. 1977). The plaintiff has the burden of proving the insurer's bad faith. ***Palmer,*** 723 S.W.2d at 126. Whether an insurer acted in good faith is generally a fact question for the jury. ***Mason v. Tennessee Farmers Mut. Ins. Co.,*** 640 S.W.2d 561, 567 (Tenn. Ct. App. 1982).

Allstate argues that Solomon failed to make a formal demand as required by the statute. It further contends that the lawsuit was premature because Solomon waited only 44 days after the denial of her claim to file suit.

We disagree on both counts. The formal demand requirement in T.C.A. § 56-7-105 gives insurers "notice of the claim for bad faith and a period in which to reflect upon the consequences of its failure to pay." *See **Walker,*** 568 S.W.2d at 107. Upon reviewing the record, we find that there is material evidence to support a finding that Allstate had ample time to contemplate the consequences of its denial of the plaintiff's claim. Solomon contacted Allstate on numerous occasions to inquire about coverage and to request that her claim be processed and paid. Each time she contacted the company, she was advised that Allstate would not pay. We find that the plaintiff's actions gave Allstate adequate notice and time to contemplate the possibility of a bad faith lawsuit. Moreover, we do not find that the lawsuit was "premature." An insured need not wait the statutorily-required 60 days before filing suit if the insurer refused to pay prior to the expiration of that period. *See **Palmer,*** 723 S.W.2d at 126. The evidence reflects that Allstate refused to pay the plaintiff's claim on several occasions; the last of those denials being on June 25, 1997. Because Allstate had already notified her of its refusal to pay, Solomon was not required to wait 60 days following her formal demand before filing suit. Allstate's arguments as to this issue are without merit.

Allstate next argues that the amount of the bad faith penalty was excessive. We disagree. The evidence reflects that the house the plaintiff expected to build for $65,000 has so far cost her $111,000, and the cost of repairing the damage caused by the collapse of the basement wall is more costly than tearing the house down and rebuilding it. Immediately after the wall collapsed, the plaintiff made repeated attempts to have the insurer inspect the structure, without success. She repeatedly asked her agent to file a claim under her policy, and her request was repeatedly denied. The plaintiff finally filed the claim herself, and, after months of discussions with the agent and the claims adjuster, was ultimately told that her claim, which the jury found to be meritorious, was denied. There is material evidence in this record to support the penalty assessed by the jury, and we will not disturb that award.

## VIII. *Consumer Protection Act*

Allstate's final argument relates to the plaintiff's claim under the Consumer Protection Act. First, it contends that the claim is barred by the one-year statute of limitations set forth in T.C.A. §

47-18-110 (1995). The plaintiff, on the other hand, argues that her amended complaint relates back to the filing of the original complaint pursuant to Tenn. R. Civ. P. 15.03.[6]

In order to ascertain whether an amended complaint relates back, we must determine whether the amended claims arose out of the same conduct, transaction or occurrence as the claims set forth in the original complaint. **Karash v. Pigott,** 530 S.W.2d 775, 777 (Tenn. 1975); **Hawk v. Chattanooga Orthopaedic Group,** 45 S.W.3d 24, 31 (Tenn. Ct. App. 2000), *perm. app. denied* February 26, 2001. Upon reviewing the record, we conclude that the plaintiff's Consumer Protection Act claim arises out of the same conduct, transaction or occurrence relied upon in the original complaint. Thus, the amended claim is not time barred.

Finally, Allstate argues that an insured is not entitled to recover damages under the Consumer Protection Act for an insurer's refusal to pay a claim.

We think that Allstate mischaracterizes the nature of Solomon's claim under the Consumer Protection Act. The plaintiff alleged below that Allstate committed an unfair or deceptive act by representing to her that any damages that resulted during the construction of her house would be reimbursed under the policy. The plaintiff is basing her Consumer Protection Act claim upon misrepresentations made by the insurer in selling her the policy. Such misrepresentations are clearly covered by the Act. *See generally* T.C.A. § 47-18-104 (Supp. 2000). This issue is found adverse to Allstate.

## IX. *Conclusion*

The judgment of the trial court is affirmed. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Allstate Insurance Company.

_____
CHARLES D. SUSANO, JR., JUDGE

---

[6]Tenn. R. Civ. P. 15.03 provides, in pertinent part, as follows:

> Whenever the claim or defense asserted in amended pleadings arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back tho the date of the original pleading.