Thomas B. RIDINGS, Plaintiff–Appellee,

v.

NORFOLK SOUTHERN RAILWAY COMPANY, Defendant–Appellant.

Court of Appeals of Tennessee, Eastern Section.

November 15, 1994.

Application for Permission to Appeal Denied by Supreme Court Feb. 21, 1995.

Arthur G. Seymour, Jr., James E. Wagner, Knoxville, for appellant.

C. Marshall Friedman, Patrick S. O'Brien, St. Louis, MO, Donna Davis, Davis, Arnold, Haynes & Sanders, Knoxville, for appellee.

## OPINION

SUSANO, Judge.

This is a suit for damages brought under the Federal Employers' Liability Act (FELA) by Thomas B. Ridings (Ridings) against his employer, Norfolk Southern Railway Company (Norfolk Southern), arising out of an injury the Plaintiff sustained at work. Norfolk Southern appeals the Judgment of the trial court awarding Ridings damages of $1,189,481.20 based upon a jury verdict in his favor.

Norfolk Southern raises the following issues:

1. Was there evidence of a connection between negligence on the part of Norfolk Southern and the cause of Ridings' injury?

2. Did the trial court err in charging the jury as to the standard of liability under FELA?

3. Did the trial court err in failing to give requested jury instructions regarding the Americans with Disabilities Act and the Age Discrimination in Employment Act?

4. Did the trial court fail to approve the verdict as the thirteenth juror?

I

Ridings injured his back while attempting to maneuver a "warehouse ladder" on the floor of the Coster Shop, the Norfolk Southern facility at which he worked. As a result of his injury, he was rendered totally and permanently disabled. It is Ridings' theory that his injury was caused by a combination of negligent acts and omissions on the part of Norfolk Southern. On the other hand, Norfolk Southern asserts that there is no material evidence that the injury sustained by Ridings was causally related to any negligent act or omission on its part. In effect, the railroad argues that even assuming that the Plaintiff proved that it was guilty of negligent acts or omissions, there was no proof of a nexus between those acts and omissions and the facts which the Plaintiff relies upon to show how his back injury occurred. On this issue, we must examine the record to see if there is material evidence of a connection. Tenn.R.App.P. 13(d).

Ridings worked for the Norfolk Southern as a carman. He performed various repairs and tests on rail cars at the railroad's Coster Shop in Knoxville, a facility constructed around 1907. In some places, the floor of the Coster Shop is concrete while other parts of the floor consist of wood blocks. Over time, the floor has become uneven and rutted, a great deal of which was the result of years' worth of molten metal from rail car repairs dripping down onto and burning the wood floor. The concrete floor has holes, depressions, and rough spots. There has been no effort to re-surface the whole floor or substantial parts of it. Portions have been patched from time-to-time as Norfolk Southern saw fit.

A cable runs along the floor of the Coster Shop and is used to move rail cars into and out of the shop. There was testimony that the cable sits flush with the floor in most places, but that in a few places, including the southern end of the shop alongside track 2, the cable is as much as "three or four and sometimes even five inches off of the ground." Ridings' expert testified that "the cable always stays taut," due to a system of weights attached to one end.

As a carman, Ridings used an apparatus called a warehouse ladder to work on the rail cars. A photograph of the ladder is attached as Appendix A to this Opinion. Ridings testified that part of his job entailed moving the ladder across the concrete and wood floor of the Coster Shop, and that the shop floor was "just a rough place to try to move something with ... wheels that small as heavy as that [ladder] is." The ladder was used to reach parts of the rail cars which could not be reached from the floor. Ridings' expert testified that he measured the ladder's wheels as being only four inches in diameter. Ridings and others testified that they had complained at safety meetings over a period of two or three years before his accident about the difficulty of moving the heavy warehouse ladders over the rough, broken floor and the cable. Ridings estimated that the ladder weighed about 200 pounds. He called as an expert witness a professor of structural engineering, who examined the ladder and the work site. The professor testified that the ladder, which "[a]ccording to specification sheets" weighs over 210 pounds, was designed for use on "nice level floor[s]" and that it was "an inappropriate use of that particular ladder" to use it on the Coster Shop's rough floor. He further testified that he had no problem with the ladder's design, only its use at the Coster Shop.

A former officer of the company that sold the ladder to the railroad testified that this type ladder with wheels was designed to be used "on a flat, smooth, hard surface." He testified specifically that it was not designed for use on a rough surface such as the one at the Coster Shop.

On October 19, 1988, at about 11:00 PM, Ridings was working as a second-shift carman at the Coster Shop. He testified that he had just finished working on one corner of a 100 ton-type rail car when he attempted to pick up the end of the ladder to rock it and thereby maneuver it across the floor's rough surface and the raised cable along track 2:

> I got down, reached down with my right hand and picked up on that bottom scaffold on the right, you know, the step, and you

have to guide yourself with that handle on the rail up there, and I twisted, you know, to get it to rock and going. It didn't move. And when I really hit it hard, twisting it, that's when I felt something pop in my lower back.

Ridings testified that he then moved the warehouse ladder across the cable, but

I felt it in my lower back. I had to set the [ladder] down. I started straightening up real easy. And after I eased off a little bit, I went ahead and pulled the [ladder] over there across the tracks over there on the other side to place it, to where we could move them [rail] cars.

As a result of his injury, Ridings has undergone repeated medical treatments—including three surgeries—which have failed to alleviate his back problem.

Ridings filed suit against Norfolk Southern alleging that Norfolk Southern negligently "failed to provide reasonably safe conditions for work in that the wood and concrete floor was rough ... and would not permit the ladder wheels to roll properly," failed "to provide reasonably safe methods for work," failed "to provide reasonably safe and adequate appliances, tools and equipment in that the four inch wheels on the ladder were of improper size and made it extremely difficult for one man to roll the ladder," and finally failed "to provide sufficient manpower to perform the task assigned in that two men were needed to move the ladder." Ridings asserted that the railroad's negligence caused him to suffer "serious, painful, progressive, permanent and disabling injuries and damages" to his back, and in turn to suffer from limitations of movement and function "of the lumbosacral spine, hips, and lower extremities," as well as "traumatic arthritis." In its Answer, Norfolk Southern denied all of Ridings' allegations of negligence and averments of injury, and plead the doctrines of contributory negligence and mitigation of damages.

Ridings called as witnesses five former carmen and James H. Roberts, Jr., a former foreman from the Coster Shop, all of whom testified that the Coster Shop floor was in poor condition, especially on the southern end of track 2 where Ridings was injured. Several of the witnesses also stated that the rail car moving cable rose considerably above the floor in that area, and that the carmen had complained repeatedly prior to Ridings' accident about the difficulty of moving the warehouse ladders in the vicinity of track 2. Roberts further testified that some of the ladders had been modified by mounting much larger wheels which made the ladders "easier to move over the floor and the cables." Roberts testified that they mounted the larger wheels sometime during the period 1986–1988. The ladder being moved by the Plaintiff had not been modified at the time of the accident.

Ridings called two of his treating physicians as expert witnesses: Dr. Gilbert Hyde, an orthopedic surgeon, and Dr. John T. Purvis, a neurosurgeon. Dr. Hyde testified that in his opinion the October, 1988, accident was the cause of Ridings' injuries and necessitated his back surgeries, that the accident had left Ridings unemployable, and finally that he would need periodic medical treatment for the remainder of his life. Dr. Purvis testified that he performed surgery on Ridings' back, fusing a portion of his spine and finally recommending placement of a dorsal spinal cord stimulator as "a last ditch effort" to control Ridings' pain.

Dr. Julian Nadolsky, a vocational rehabilitation expert, also testified as a witness for the Plaintiff. Nadolsky stated that based on his interview of Ridings and a review of his medical records, Ridings "has been 100 percent disabled for employment since he last worked." Nadolsky further stated that "I think Mr. Ridings will not be capable of engaging in gainful employment as long as he has anywhere near the degree of pain that he presently has or that he had when I saw him."

Ridings also called a retired professor of economics, who testified that he weighed "certain data and certain assumptions," such as Ridings' statistical life expectancy, his pay and benefits as a railroad employee, his pay and possible benefits as a reserve non-commissioned officer, and the financial value of his services around the home. He then estimated Ridings' lost income due to his injury, arriving at a figure of $1,023,384 on the

assumption that Ridings retired at age 65, and a figure of $1,227,086 assuming a retirement age of 70.

The jury found for Ridings and awarded damages of $1,232,862. This amount was later reduced by payments which had been made to Ridings by Norfolk Southern or in connection with his employment with the company.

■ As indicated, Norfolk Southern argues that there is no material evidence demonstrating a cause and effect relationship between Norfolk Southern's negligence and Ridings' injury. This position essentially asserts that Norfolk Southern's negligence was not the cause of Ridings' injury. The FELA does not make railroads the insurers of their employees. The mere occurrence of an accident does not automatically render an employer liable. *Southern Ry. Co. v. Bradshaw*, 73 Ga.App. 438, 37 S.E.2d 150 (1946). Rather, a "relaxed standard of proof" is said to apply under FELA. *Knowles v. Burlington Northern R. Co.*, 18 Kan.App.2d 608, 856 P.2d 1352, 1355 (1993); *see also Nelsen v. Research Corp. of University of Hawaii*, 805 F.Supp. 837 (D.Hawaii 1992). Therefore, plaintiffs are required only to prove that a railroad's negligence played any part, even the slightest, in producing injury or death. *Hall v. Norfolk Southern Ry. Co.*, 829 F.Supp. 1571 (N.D.Ga.1993); *Mitchell v. Missouri–Kansas–Texas R. Co.*, 786 S.W.2d 659 (Tex.1990).

■ In the case at bar, Norfolk Southern's failure to provide safe working conditions and appliances subjected its employees to a variety of potential perils. Ridings and his fellow carmen testified that the weight of the warehouse ladders made them unwieldy, and cited instances when they had toppled over onto electrical lines and nearly onto employees. These previous "near misses," plus the workers' repeated complaints about the ladders and the Coster Shop floor, put Norfolk Southern on notice that the ladders were inappropriate for the Coster Shop work environment. Norfolk Southern should have

foreseen that the ladders were too heavy to be moved safely in the Coster Shop by individual carmen, that a paucity of workers on the evening shift made it unlikely that two employees would always be available to move the ladders, and that eventually the heavy ladders would cause injury. There was material evidence from which the jury could determine that the negligence of the Norfolk Southern was the cause of Ridings' injury.

## II

■ The Appellant next argues that the trial court incorrectly charged the jury regarding the standard of liability under the FELA. Specifically, the Appellant complains of the following charge [1]:

> In order for you to find for the plaintiff, it must be shown not only that the defendant was negligent, but also that such negligence caused or contributed in whole or part to plaintiff's injury and consequent damages. If plaintiff's injury and damage resulted wholly from some cause, other than the negligence on the part of the defendant, your verdict must be for the defendant.

> Now for purposes of this case, this lawsuit, injury or damage is said to be caused or contributed to by an act or failure to act when it appears from a preponderance of the evidence in the case that the act or omission played any part, **no matter how small**, in bringing about or actually causing the injury or damage. So if you should find from the evidence in the case that **any** negligence of the defendant contributed in any way toward any injury or damage suffered by the plaintiff, you may find that such injury or damage was caused by the defendant's act or omission. (Emphasis Added).

It is the Appellant's contention that it was error for the trial court to refer to *"any* negligence of the defendant." The Appellant's dispute is with the word "any." It also argues that the "no matter how small" language of the charge does not accurately set

---

1. The trial court's charge regarding negligence and related concepts was more extensive than as quoted in this Opinion; however, it is only neces-

sary in this case to recite the portion complained of to reach the issue raised by the Appellant.

forth the standard of liability under the FELA.

We do not perceive a difference, in the context of this instruction, between the language "any negligence of the defendant" and the language, "negligence of the defendant," the latter phraseology apparently being acceptable to the Appellant. Whether the trial judge referred to "any negligence of the defendant" or simply to "negligence of the defendant," the negligence concept was fully and accurately modified by the language that followed—"contributed in any way toward any injury or damage suffered by the plaintiff." The modifying language clearly indicated to the jury that the focus was on a certain kind of act or omission, one having a nexus to the injury or damage. The use of the word "any" did not render the charge erroneous.

The Appellant's primary objection to the charge is the use of the words "no matter how small." The Appellant correctly points out that this language comes from the decision of the United States Supreme Court in the FELA case of *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957):

> Under [the FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.

*Id.* 352 U.S. at 506, 77 S.Ct. at 448. The Appellant argues that the statement from the *Rogers* case is a **test** of a jury case, and not a statement of the standard of liability under the FELA to be passed along to the jury as a part of the court's instructions. It argues that it is improper to instruct the jury regarding this "test," and cites the cases of *Iannacito v. Denver & Rio Grande Western Railroad*, 380 F.2d 1019 (10th Cir.1967); *Bertrand v. Southern Pacific R. Co.*, 282 F.2d 569 (9th Cir.1960); and *Dessi v. Pennsylvania Railroad Co.*, 251 F.2d 149 (3rd Cir.1958), in support of its position. The Appellee disagrees and relies upon a number of cases including the Sixth Circuit case of *Hausrath v. New York Central Railroad Company*, 401 F.2d 634 (6th Cir.1968).

We believe that to differentiate between a "test of a jury case" and "the standard of liability under the FELA" is to cite a distinction without a difference. If the test is that set forth in *Rogers,* what is the justification for hiding it from the jury, the body which is charged with the responsibility for determining liability? If "even the slightest" causation triggers liability, should not the jury be made privy to this information? The questions are rhetorical in nature. A jury should not be required or allowed to speculate as to the appropriate standard of causation in a FELA case when the highest court in the land has decreed a very specific standard.

The issue at hand was addressed in the recent United States Supreme Court case of *Consolidated Rail Corporation v. Gottshall,* —— U.S. ——, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), wherein Justice Thomas, speaking for the Court, reiterated the *Rogers* standard of causation:

> We have liberally construed FELA to further Congress' remedial goal. For example, we held in *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), that **a relaxed standard of causation applies under FELA.** We stated that "[u]nder this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." (Emphasis added).

*Id.* —— U.S. at ——, 114 S.Ct. at 2404. *Consolidated Rail Corporation* makes it clear that there is a "relaxed standard of causation" under the FELA. The jury must be made aware of that relaxed standard if it is to properly perform its function as the trier of fact. To charge the jury in the usual way regarding the standard of causation would be contrary to the teachings of *Rogers* and *Consolidated Rail Corporation.* Whatever doubt might have existed regarding the subject charge was certainly settled in *Consolidated Rail Corporation.*

We note, parenthetically, that we see no difference in the *Rogers* language of "even the slightest". and the trial court's language

in the instant case—"no matter how small." They mean the same thing.

The court's charge regarding the standard of liability under the FELA was correct.

## III

■ Norfolk Southern's next issue is that the trial court erred by failing to give requested jury instructions regarding the Americans with Disabilities Act [2] (ADA) and the Age Discrimination and Employment Act [3] (ADEA). We note in passing that this is a personal injury tort suit under the FELA, not a suit under the ADA or ADEA. We next observe that trial judges may reject a requested instruction for a variety of reasons, and the general rule is that they will not be reversed unless the rejection injured the party requesting it. See Gulf Compress Co. v. Ins. Co. of Pennsylvania, 129 Tenn. 586, 167 S.W. 859 (1914). Trial courts need not give a requested instruction unless there was supporting evidence on that issue introduced during the trial. See Monday v. Millsaps, 37 Tenn.App. 371, 264 S.W.2d 6 (1953). In the case at bar, Norfolk Southern did not put on any proof at trial that Ridings could obtain employment because of the existence of the ADA and ADEA. Furthermore, the court permitted Norfolk Southern's counsel to cross-examine the Plaintiff's vocational rehabilitation expert at length on possible effects of the federal acts.

The ADA and the ADEA are federal acts providing remedies to potential plaintiffs for acts of discrimination by potential employers and others. Those enactments become relevant when it is alleged that a specific entity or individual has discriminated against someone in a certain way under certain circumstances described in the act. In the instant case, the jury was not being asked to determine whether Ridings had a cause of action under either one or both of these acts. By definition, that issue was not a part of this cause of action in this FELA case. There was no reason to charge the jury as to the Plaintiff's rights under these acts. The issue was whether the Plaintiff was disabled as a result of his injury and the extent of his

disability and how it has and might, in the future, affect his ability to work in gainful employment. The issue of the Plaintiff's rights under the ADA and the ADEA were entirely collateral to the issues before the jury. Cf. Spencer v. A–1 Crane Service, Inc., 880 S.W.2d 938, 942 (Tenn.1994) (holding that the non-taxability of a personal injury award is a collateral issue and that it was not error for the trial court to refuse to instruct the jury that a personal injury award is not taxable).

■ We note that the trial court did read to the jury a very general charge on the ADA's main thrust (though the charge did not mention the act by name or initials). Although the trial court was not required to give even an abbreviated charge on this collateral issue, it did not commit a reversible error in doing so. Tenn.R.App.P. 36(b). We believe that the trial court's refusal to give the requested charges on the ADA and ADEA was correct.

## IV

■ The Appellant complains that the trial court did not perform its function as thirteenth juror. We disagree.

■ If a trial court is called upon to act as a thirteenth juror following the filing of a motion for a new trial, the trial court must be independently satisfied with the verdict of the jury. Cumberland Telephone & Telegraph Co. v. Smithwick, 112 Tenn. 463, 79 S.W. 803 (1904); Holden v. Rannick, 682 S.W.2d 903 (Tenn.1984); Miller v. Doe, 873 S.W.2d 346 (Tenn.App.1993). In performing this function, the trial court must itself weigh the evidence heard by the jury. Id. If after weighing the evidence, the trial court is satisfied with the verdict, it is that court's responsibility to approve the verdict; on the other hand, if it is not satisfied with the verdict after weighing the evidence, the trial court must grant a new trial. The trial court's performance of its function as thirteenth juror must be performed without regard to and without deference being shown to the result

---

**2.** 42 U.S.C.A. § 12101, et seq.

**3.** 29 U.S.C.A. § 621, et seq.

reached by the jury. As the thirteenth juror, the trial court acts as a jury unto itself in evaluating and weighing the evidence presented at the trial.

When "the trial judge simply approves a verdict without any comment, it is presumed by an appellate court that he [or she] has performed his [or her] function adequately." *Miller* at 347. *James E. Strates Shows, Inc. v. Jakobik*, 554 S.W.2d 613, 615 (Tenn.1977). On the other hand, where, as here, the trial court makes comments on the record in the course of reviewing a motion for a new trial, we will review those comments; but we do not review those comments to see if we agree with the trial court's reasoning, but rather to determine "whether the trial court properly reviewed the evidence, and was satisfied or dissatisfied with the verdict." *Miller* at 347. If the trial court's comments indicate that it has misconstrued its duty as thirteenth juror, and has approved the verdict for some reason other than its own satisfaction with the verdict based upon an independent evaluation of the evidence, it is our responsibility to reverse and remand the case for a new trial. *Miller* at 347; *Nelson v. Richardson*, 626 S.W.2d 702, 704 (Tenn.App.1981).

The trial court's comments in this case must be evaluated in light of the grounds of the motion for a new trial. In addition to four grounds which alleged error in the court's charge and two grounds which complained of errors regarding the cross-examination of the Plaintiff's expert, Dr. Julian Nadolsky, the motion assigned the following five grounds which prompted the trial court to discuss the evidence in this case:

1. The verdict of the jury is contrary to the weight of the evidence.

2. The verdict of the jury is contrary to the law and the evidence.

3. The verdict of the jury was so excessive so as to evidence passion and caprice on the part of the jury.

4. The verdict of the jury was so excessive as to warrant a substantial remittitur.

5. The Court erred in failing to direct a verdict for the defendant at the conclusion of all the evidence.

It is clear that a portion of the trial judge's remarks were addressed to issues raised in the motion which were quite separate and apart from the performance by the court of its role as thirteenth juror, e.g., questions raised as to the excessiveness of the verdict and whether a verdict should have been directed for the Defendant at the conclusion of all proof. Comments of the trial court with respect to these other issues should not be interpreted by us as a failure to properly perform the role as thirteenth juror, since they were not offered by the trial court in the context of his role as thirteenth juror.

At the beginning of its comments on the motion for a new trial, the court made these relevant statements:

THE COURT: In passing on these post-trial motions I sometimes make some comments about the arguments and positions the parties have taken. I always have a little bit of reservation about that because I think sometimes those comments which are not intended to be exhaustive or completely dispositive of the arguments and issues raised by the parties might be misunderstood by the parties themselves, or their counsel, or even by the Court of Appeals.

My own sense about dealing with these things tells me that it probably would be better for trial judges simply to say that the motion is either sustained or overruled but; nevertheless, it's my tendency to comment about some of those things because I think litigants are entitled to know what the Court is thinking. But I don't intend to deal at any great length with the various issues that have been raised today, but may make some comments in disposing of this motion.

The sentiments expressed by the trial judge are admirable. While a simple "I approve of the jury's verdict" would pass muster with us, the trial judge was acting appropriately in discussing the case, evidence presented by the parties, and his thought process as he reviewed the grounds of the motion. Also, we believe that the comments of the trial judge must be evaluated in light of his statement that his comments were not intended "to be exhaustive or completely dispositive of

the arguments and issues raised by the parties." In our review, we are simply trying to determine whether Judge Rosenbalm understood his function as thirteenth juror and performed that function properly.

After reviewing the trial judge's comments, we are convinced that he understood his role as thirteenth juror. We believe the comments[4] relied upon by the Appellant to demonstrate that the trial court did not properly perform its function as thirteenth juror were comments directed by the trial court at the Appellant's claim that the verdict was excessive. Those comments were immediately followed by a separate thought which tells us that the trial court did understand its role as thirteenth juror:

> **Certainly** the verdict and the result is not such that this Court in the exercise of its function as a thirteenth juror could in good conscience set aside. I'm constrained to overrule the motion.

The use of the word "certainly" following his comments on the issue of excessiveness of the award, tells us that Judge Rosenbalm was then "changing gears" and going into his function as thirteenth juror. We find the

Appellant's issue as to Judge Rosenbalm's performance of this function as thirteenth juror to be totally without merit.

## V

Acting **sua sponte,** we find it appropriate to reduce the Judgment in this case from $1,189,481.20 to $1,188,481.20. The trial court's Judgment recites that the jury verdict was $1,233,862; however, the Special Verdict Form in the record before us, which is signed by the jury foreman, reflects the jury verdict as $1,232,862. By a post-Judgment Order, the trial court reduced the Judgment by $44,380.80 for credits which are not at issue on this appeal. When these credits are subtracted from the actual jury verdict, the result is a Judgment for the Plaintiff of $1,188,481.20.

The trial court's Judgment, as modified, is affirmed, and this cause is remanded to the trial court for the collection of costs and such other action as may be appropriate. The costs of this appeal are taxed and assessed against the Appellant and its surety.

LEWIS and McMURRAY, JJ., concur.

---

4. The part of the trial court's comments which the Appellant relies on are as follows:

> But without indulging in the interesting intellectual exercise of trying to figure out just exactly how the jury arrived at this verdict, the Court is constrained to conclude that in view of the evidence that was before the Court, and in view of the jury's important function in resolving credibility issues that the verdict is within that range of reasonableness based upon the evidence that the jury heard which compels the Court to approve the verdict and deprives the Court of any opportunity to substitute its judgment in any way for the amount of that verdict so; again, I feel like I have to discharge this important but very difficult, extremely difficult task of passing upon the amount of the verdict by concluding that under the evidence this jury heard it was a matter for the jury to say, not for the Court.