IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 13, 2005 Session

## STACE LEE THOMPSON v. THE CITY OF LAVERGNE

**Appeal from the Chancery Court for Rutherford County**
**No. 01-2556MI     Robert E. Corlew III, Chancellor**

_____

**No. M2003-02924-COA-R3-CV - November 16, 2005**

_____

This appeal involves an action brought by Lieutenant Stace Thompson of the City of LaVergne Police Department under the Tennessee Human Rights Act. Lt. Thompson alleged he was demoted as a result of investigating the alleged sexual harassment of a police officer within the department by the administrative assistant to the Chief of Police. After a trial by jury, judgment was rendered in favor of Lt. Thompson in the amount of $300,000.00 for embarrassment and humiliation and $4,000.00 for loss of benefits. The City of LaVergne has appealed. Finding no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded.**

DONALD P. HARRIS, SR. J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ, joined.

Keith F. Blue and Molly R. Cripps, Nashville, Tennessee, for the appellant, The City of Lavergne.

Roger S. Waldron and Terry A. Fann, Murfreesboro, Tennessee, for the appellee,. Stace Lee Thompson

**OPINION**

Stace Thompson has been employed by the LaVergne Police Department since 1989. At the time of trial he was forty-three years of age and married to Ann Thompson, also with the LaVergne Police Department. They have seven children, four together and three from Ms. Thompson's prior marriage.

He started out at LaVergne as a patrolman and became a field training officer in 1990 or 1991. He later was promoted to corporal and transferred to the Criminal Investigation Division. (C.I.D.) In the summer of 1998, Howard "Butch" Morris was hired by the City of LaVergne as its Chief of Police. He brought with him, as his administrative assistant, Lisa Lewis. Morris and Lewis had previously worked together at the Tennessee Bureau of Criminal Identification. Their behavior while on duty led other officers and employees of the LaVergne Police Department to believe they

had a close relationship. For example, Lewis, who initially had no rank, frequently gave orders to officers without the real authority to do so. If these orders were not followed, however, there would be a response from the Chief. On one occasion, Chief Morris was observed patting Ms. Lewis on the behind. On another, the Chief and Ms. Lewis were sitting in her office and when the dispatcher came to obtain her assistance, she stated, "Hold on, I need to put my pants on." She stood up and her pants were unzipped and unbuttoned. She fastened her pants in the presence of the Chief and left her office. As a final example, Chief Morris became obviously upset when Ms. Lewis developed romantic relationships with other officers.

Initially, Chief Morris and Thompson got along well. Morris promoted him twice, from Corporal to Sergeant in charge of the Criminal Investigation Division (C.I.D.) and, in 1999, to Lieutenant in charge of C.I.D. Thompson was assigned a vehicle that he was instructed to operate seven days a week due to his always being on call. The function of the investigators in C.I.D. was to perform investigations that would be of a length greater than a patrolman could provide and also to do internal affairs investigations concerning wrong doing by police department personnel. As C.I.D. Director, Thompson was in charge of investigating complaints against police officers and police department employees.

During the time Lt. Thompson was field training officer, he trained Mike Anderson, Chris Goins and Tim Stone. At some point, Mike Anderson came to him and reported having a sexual relationship with Lisa Lewis. Chief Morris had instructed him to stop seeing Ms. Lewis but Anderson thought that was unfair since both he and Ms. Lewis wanted to continue the relationship. Thompson suggested that he go back and talk to the Chief and see if any latitude would be allowed.

Following Chief Morris finding out about Anderson and Lewis having a relationship, Anderson began experiencing adverse personnel actions. There were internal affairs investigations begun, drug tests given and polygraph examinations administered. The arrest reports he filed were scrutinized more closely than those prepared by other officers. He frequently observed a LaVergne patrol car parked across from his apartment in Antioch and marked units would drive by his house. There were times when he believed someone was listening in on telephone conversations between him and Ms. Lewis. When he and Ms. Lewis would dine at a restaurant in Rivergate or Cool Springs, one of the detectives would suddenly appear. Eventually, Chief Morris told Anderson to either resign or get fired for disobeying the Chief's direct order to have no personal contact with Ms. Lewis. Anderson resigned. Thompson felt that Anderson's treatment was unfair.

After Anderson resigned, Chris Goins contacted Thompson on the night of May 27, 2000, and told Thompson that he and Lisa Lewis were having an affair. Goins, who was married, reported that he had made a terrible mistake because he was being harassed by Ms. Lewis. He indicated he had experienced adverse treatment in personnel assignments, specifically, that he had been relieved of duty on the SWAT team. Goins stated his fear of what Lisa Lewis could do to his career. He was concerned that she could "get his job" and voiced his belief that someone needed to do something about her.

Thompson viewed what Goins had told him as a complaint of sexual harassment against Lisa Lewis. He testified that he knew Ms. Lewis was in violation of direct orders from the Chief by having sexual relationships with her subordinates within the police department and knew that she continued to violate those orders after the Mike Anderson episode. Believing that Chief Morris and Lisa Lewis had a close relationship and knowing what had happened to Mike Anderson, Thompson testified that he felt he had to be very careful so as not to cost Goins his job by speaking up.

According to Lt. Thompson, he felt obligated to intercede so he reported the matter to Don Pickard, the City Administrator for the City of LaVergne. He reasoned that he had a responsibility to take some action before Officer Goins, who was a quality police officer, lost his job. Thompson related to Pickard what he knew about the conduct of Lisa Lewis. Pickard indicated he would have the Chief come to talk with Thompson. Lt. Thompson did not hear from Chief Morris and, thereafter, the Chief seemed to avoid him. Frustrated at not being able to discuss the matter with Chief Morris, Thompson followed the Chief home and informed him there was a situation at the police department that he needed to discuss with him. Thompson reported to Chief Morris there were problems with Ms. Lewis' conduct with a particular officer, that she was still involving herself sexually with persons of subordinate rank, and that she was causing problems with this officer's family. He added that the officer felt threatened that he was going to be harassed or fired. When Thompson identified Goins as the source of this information, Chief Morris began screaming, "he's a G - - D - - liar, this is all lies and rumors." Morris ended the conversation, however, by saying he would take care of it.

Several days later Chief Morris called Thompson into his office and accused him of violating the chain of command by going to the city administrator. He was upset and said that he was going to discipline Lt. Thompson although he had not decided what the discipline would be. Later at a meeting of all the criminal investigation division and narcotics agents, Chief Morris indicated someone in the department had stabbed him in the back and had brought the department down. He indicated that whoever it was would not be getting raises or additional benefits. As he was saying this he walked toward Thompson, looking at him, and said, "You know who you are don't you?" Then he turned and walked away.

After that meeting things did not go well between Lt. Thompson and Chief Morris. He continued receiving reports from Chris Goins. In one of those conversations, Goins indicated he had been threatened by the Chief who warned Goins that if he said anything else about Lisa Lewis there would be a physical altercation between them. Goins indicated he was concerned and repeated that someone had to do something about Lisa Lewis.

A third LaVergne Police officer, Tim Stone, came to Thompson and reported he was having an affair with Lisa Lewis. Stone was a field training officer for the City of LaVergne Police Department, having been promoted by Chief Morris. Officer Stone was the Marine Patrol Officer and patrolled in a boat. Chief Morris liked the boat and he and Officer Stone got along well until Stone had the encounter with Lisa Lewis. After he and Ms. Lewis began having a sexual relationship, Chief Morris called him into his office, accused him of being an alcoholic and said that

he needed help. After that time, Chief Morris did not speak to him at all. A short time later the Chief put another officer in charge of the marine patrol boat.

On Christmas Eve of that year, Lisa Lewis phoned Officer Stone and asked him to come over. He went because he was afraid that if he did not she might try to cause him problems at work. According to Officer Stone, she had a lot of power and influence with Chief Morris. He went to her apartment in Hickory Hollow and they had sexual relations. Stone reported the incident to Stace Thompson. He voiced to Lt. Thompson his concern that Ms. Lewis might retaliate against him. According to Stone, he was, some time later, thrown out of O'Charley's for no apparent reason. As a result of the incident, Chief Morris suspended him without pay for a period of two weeks. Lisa Lewis personally took his badge and pistol and, according to Stone, seemed to enjoy doing so.

Thompson continued reporting to the City Administrator, Don Pickard, in response to Pickard's requests for information. Pickard never suggested Thompson file a report with Deputy Chief Marlene Hall or the City Attorney, David Bolin. Thompson indicated he would have complied with such a request. Thompson continued his investigation of Ms. Lewis by taking reports from persons coming to him with information. He continued his investigation of Ms. Lewis in this manner until the time of his transfer.

Thompson began encountering problems getting records from the records department supervised by Lisa Lewis. Normally C.I.D. agents have unlimited access to those records because of the nature of the cases they work, including internal affairs cases. C.I.D. investigators need to look at tickets, reports, supplemental reports and items of that nature. After he began talking to Mr. Pickard, he was refused access to these records without the express permission of Lisa Lewis. No other detective or lieutenant had to obtain such permission. He reported the situation to Chief Morris but nothing changed.

On January 5, 2001, the Chief called a meeting with regard to a contract four officers had signed in order to be promoted to lieutenant. That contract provided that they would have forty months to obtain a college degree. In response to the contract, Lt. Thompson enrolled in some courses at Columbia State University but failed to complete any of them. The Chief came into the meeting mad that none of the officers had made significant progress toward obtaining their degree. Chief Moore indicated he could either demote them or leave them at their present rank and reorganize the department. He indicated he would think about it and give them his answer at a staff meeting the next week.

On January 8, 2002, Chief Morris met with Lt. Lynn Ruch and told Ruch that he and Lt. Thompson were the two persons who had brought down the police department. He told Ruch to be sure that Thompson got the message. On January 16, 2001, Lieutenant Thompson went to work and was met by Ruch. Lt. Ruch told him that the Chief had said that Thompson was his worst enemy.

On January 19, 2001, Thompson was approached by Kristina Barrett. Ms. Barrett reported that she had been instructed by Lisa Lewis not to speak with Ann Thompson. She was told that if

-4-

Ms. Lewis found out she had talked with Ms. Thompson and did not report the conversation, she would be written up for insubordination. She was also instructed not to be around Lt. Thompson.

At a staff meeting in late February or early March 2001, it was announced that Lt. Thompson was being transferred to the midnight patrol shift, effective mid-March 2001. Thompson viewed the move as a demotion and retaliation for his investigation of the activities of Lisa Lewis. Chief Morris had never been critical of Lt. Thompson's performance in C.I.D. except for the criticism related to his having gone to the city administrator concerning Lisa Lewis. Thompson did not desire to return to a uniformed position and testified it was generally known in the police department that an officer needed to be division commander of C.I.D. in order to advance to a more senior position.

When he arrived at work the evening his transfer was to take effect, he was met by Lisa Lewis who said "Ha". Officer Thompson testified that he felt humiliated and embarrassed. Since the transfer, other officers have treated him badly, often shunning him. Fellow officers have let him know they felt they could get into trouble by publicly talking to him or being his friend.

In addition to the transfer, Thompson lost the vehicle he had been provided. Since his wife worked days, his transfer to midnights meant less time with her and less time with his children. When the children were up he was always required to sleep and was unable to attend their ball games and other activities.

Thompson indicated that he was hopeful in November and December 2001, when Chief Morris, Lisa Lewis and Deputy Chief of Police Marlena Hall were fired or resigned, that his situation would improve. There have been no changes since that time, however, and no one has offered to reconsider his transfer. After Steve Lindsay was named Chief of Police, Sergeant Kyle Norrod was placed in charge of C.I.D. No one has spoken with Thompson about going back to his old position as a lieutenant in charge of C.I.D. even though he believes he performed well in that position. Lt. Thompson believes his future with the LaVergne police department has been damaged and that the City no longer wants him there.

Lt. Thompson indicated there is a *code of silence* among some police officers. They believe that if one officer becomes aware another is doing something inappropriate or out of policy, he or she should not necessarily come forward and report on a fellow officer. Officers who do come forward may be ostracized or shunned because of it. Thompson testified that he refused to stay silent because he felt Officer Anderson was a victim of unjust employment actions, that Officers Goins and Stone were also victims and that he had a responsibility to do something about it.

Lt. Thompson acknowledged General Order 305, relating to internal affairs investigations, required the C.I.D. supervisor to process internal affairs complaints by first reporting them to the chief of police or deputy chief of police and initiating investigations only after consultation with one of these officials. Lt. Thompson admitted he did not get the approval of the chief or deputy chief of police to conduct an internal affairs investigation with regard to Lisa Lewis. Moreover, the City Employee Handbook requires sexual harassment complaints to be made in writing to either the employee's immediate supervisor, the employee's department head, the City Administrator or the

Mayor. Lt. Thompson did not make a written complaint on behalf of Officers Goins and Stone under the procedure as set out in the policy.

Marlene Elaine Hall, the former Deputy Chief of Police for the City of LaVergne, had become the director of Public Safety at Syracuse University in New York. She attended Vanderbilt University where she graduated with a bachelor's degree in psychology. She worked at Vanderbilt in the police and security department, starting as a dispatcher and advancing through various units. When she left Vanderbilt, she was in charge of the crime prevention unit. In 1998, she went to the LaVergne Police Department as their Assistant Chief and eventually became Deputy Chief. She left there in 2001 and moved to Syracuse in 2002.

When she was with the LaVergne Police Department, Howard "Butch" Morris was the Chief of Police. They had met when she was a dispatcher at Vanderbilt and he was a supervising corporal. Ms. Hall described Lisa Lewis as the executive assistant to the chief and to the assistant chief during the time she was with the City of LaVergne. Ms. Lewis was also the evidence technician and in charge of records management. Ms. Hall opined that other people thought Ms. Lewis had more influence than she actually did.

During 1999, Chief Morris was considering creating some lieutenant positions within the department. He wanted there to be a requirement for those who applied to have a college education. There was some concern about that requirement eliminating persons who had invested a lot of time in the department and who had proven their dedication to it. The decision was made that if such persons contracted to obtain a college degree within a certain period of time, the requirement would be waived and they would be considered for promotion to these positions. Four sergeants within the department signed such contracts in November 1999 and were promoted to lieutenant. Ms. Hall indicated that it was in response to these officers' failure to advance their education that Chief Morris decided to reorganize the police department. Transfers were made, according to Ms. Hall, with the idea of transferring strengths observed in some areas to places where Chief Morris and she felt improvement was needed. Ms. Hall indicated that Lieutenant Lindsay on the day shift had been doing an outstanding job in the area of community-oriented policing and she and Chief Morris felt that he could bring some positive improvements to the C.I.D. As a part of this reorganization, Lt. Thompson was transferred from the C.I.D. commander's position to being in charge of midnight patrol. Ms. Hall stated her opinion that the transfer of Lt. Thompson was not connected to his investigation of Lisa Lewis.

Based upon the evidence presented, a jury found Lt. Thompson's transfer to the night patrol division to be a result of his investigating the alleged sexual harassment of Chris Goins by Lisa Lewis and awarded $450,000.00 for humiliation and embarrassment and $7,000.00 for loss of benefits. The jury also found Lt. Thompson should be reinstated to his former position as Lieutenant in charge of the Criminal Investigations Division. The trial court granted a remittitur of $150,000.00 for humiliation and embarrassment and $3,000.00 for loss of benefits and entered a judgment for $300,000.00 and $4,000.00, respectively, ordered that Lt. Thompson be reinstated to his former position in C.I.D. and awarded $37,735.00 in attorney's fees and $3,578.50 in expenses. From that judgment, the City of LaVergne has appealed.

On appeal, the City raises four issues:

1. Whether the trial court erred in excluding the testimony of Howard H. "Butch" Morris.

2. Whether the trial court erred by refusing to dismiss a juror, Ms. Faulkner, because of misconduct in the voir dire.

3. Whether the trial court erred by misconstruing its duty as thirteenth juror.

4. Whether the amount of the trial court's remittitur for compensatory damages for humiliation and embarrassment was insufficient.

The first issue raised by the appellant is whether the trial court erred by excluding the testimony of Howard H. Morris. Morris was the Chief of Police who transferred the plaintiff from lieutenant in charge of the criminal investigation division for the City of Lavergne to lieutenant in charge of midnight patrol. Morris was still an employee of the City of Lavergne when the suit was filed on May 7, 2001. He resigned his employment in mid-November 2001. By agreement of the parties, the deposition of Morris was set for December 11 and 12, 2001. The plaintiff filed a Notice of Depostion pursuant to Rule 30.02, Tenn. R. Civ. P., and requested the defendant provide him with an address at which Morris could be served with a subpoena since he no longer was an employee of the City of Lavergne. An address was provided but no subpoena was issued and Morris failed to attend the scheduled deposition.

The depositions were reset for January 21, 2002. A subpoena was issued for Morris but was returned with the notation that service was obtained by "leaving with apartment complex office." A second subpoena was issued for the address provided and was returned with the notation "not to be found." Thereafter, plaintiff made several attempts to obtain from defendant information concerning Morris' whereabouts. On May 9, 2002, plaintiff's attorneys were told by defendant's attorney that he was still at the address previously given and would not voluntarily appear for a deposition. No additional subpoenas were issued and, on August 19, 2002, plaintiff's attorneys were informed that Morris had taken employment as the Chief of Police for Bethel, Alaska, and would not agree to attend a deposition. No effort was made to subpoena Morris either in Alaska or when he returned to Tennessee for a trial in which both he and the plaintiff were parties-defendant.

Reciting the aforementioned facts, plaintiff moved the trial court to strike the affidavit of Howard Morris filed in support of defendant's motion for summary judgment and to exclude his testimony at trial. Plaintiff's motion was granted by the trial court. Defendant alleges the exclusion of Morris' testimony was error.

Trial Courts are given wide discretion in the conduct of the trial. *Bradford v. City of Clarksville*, 885 S.W.2d 78 (Tenn. Ct. App. 1994). While limitations may be properly made on the presentation of evidence, a party should be allowed full opportunity to introduce all evidence competent and relevant to support the position of that party. *Houston v. Houston*, 1985 Tenn App LEXIS 3344, Tenn. App. No. 1027, 1985 WL 4121 (Tenn. Ct. App. December 6, 1985); *McCarter*

*v. McCarter*, 1996 Tenn. App. LEXIS 709, No. 03A01-9606-CV-000196, 1996 WL 625798 (Tenn. Ct. App. October 30, 1996). The due process right to a full hearing before a court includes the right to introduce evidence and have judicial findings based upon such evidence. *Baltimore & O.R. Co. v. United States*, 298 U.S. 349, 368, 56 S. Ct. 797, 807, 80 L. Ed. 1209 (1936).

In the case before us, the trial court was confronted with a potential witness who reportedly refused to submit to a deposition but planned on being present to testify at trial. He was not an employee of the defendant at the time any notice of deposition was filed. The plaintiff was unable to have a subpoena properly served on Morris on the two occasions an attempt was made, but no additional attempts were made, thereafter, even though Morris continued to live in the Lavergne area for several months. No attempt was made to serve him with a subpoena in the State of Alaska or upon his return to Tennessee for another trial in which he was a party. In our opinion, it was error for the trial court to have penalized the defendant by excluding a witness over whom the defendant had no control. There is no evidence the defendant abused the discovery process since the city and its attorneys had no more ability to secure the attendance of Morris for a discovery deposition than the plaintiff.

But finding the court to have erred by excluding Morris as a witness does not conclude our inquiry. Rule 103(a)(2), Tenn. R. Evid., provides that where a trial court's "ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission" must be "made known to the court by offer" or be "apparent from the context." Our courts have recognized two exceptions to the rule requiring an offer of proof. The first is contained in the rule itself and applies when the substance of the evidence and the specific evidentiary basis supporting admission is apparent from the context of the questions. The second has been fashioned by the courts and applies when exclusion of the evidence seriously affects the fairness of the trial. *First Nat'l Bank & Trust Co. v. Hollingsworth*, 931 F.2d 1295, 1305 (8th Cir. 1991); *Davidson v. Davidson*, 2002 Tenn. App. LEXIS 879, No. M2001-01830-COA-R3-CV, 2002 WL 31769205 (Tenn. Ct. App. December 11, 2002); *Blankenship v. Blankenship*, 1997 Tenn. App. LEXIS 42, No. 02A01-9603-CH-00051, 1997 WL 15241 (Tenn. Ct. App. January 17, 1997).

Obviously there is an evidentiary basis supporting admission of Howard Morris' testimony. Based upon the record before us, we do not find that either of the two exceptions to the requirement of an offer of proof apply. The substance of the evidence that would have been offered by ex-Chief Morris does not appear in the record before us. There is an indication that Morris' affidavit was filed in support of a motion for summary judgment filed by the defendant but that affidavit was not included in the appellate record and we cannot speculate as to its contents. Similarly, we do not find that the exclusion of his testimony significantly affected the fairness of the trial. The deputy chief of police, Marlene Hall, was allowed to testify as to conversations she had with then Chief Morris concerning the reasons for plaintiff's reassignment, so that information was provided the jury. Had Morris testified, he would have had to explain his relationship with Lisa Lewis and his conduct, as described by other witnesses, with regard to Lisa Lewis. It is not apparent to us that the City's case before the jury would have been improved by Morris' testimony.

An erroneous exclusion of evidence requires reversal only if the evidence would have affected the outcome of the trial had it been admitted. *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. Ct. App. 1987). Reviewing courts cannot make this determination without knowing what the excluded evidence would have been. *Stacker v. Louisville & N. R.R. Co.*, 106 Tenn. 450, 452, 61 S.W. 766 (1901); *Davis v. Hall*, 920 S.W.2d 213, 218 (Tenn. Ct. App. 1995); *State v. Pendergrass*, 795 S.W.2d 150, 156 (Tenn. Crim. App. 1989). Accordingly, the party challenging the exclusion of evidence must make an offer of proof to enable the reviewing court to determine whether the trial court's exclusion of proffered evidence was reversible error. Tenn. R. Evid. 103(a)(2); *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986); *Harwell v. Walton*, 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991). Appellate courts will not consider issues relating to the exclusion of evidence when this tender of proof has not been made. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001); *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997); *Shepherd v. Perkins Builders*, 968 S.W.2d 832, 833-34 (Tenn. Ct. App. 1997).

As stated, an offer of proof must contain the substance of the evidence and the specific evidentiary basis supporting the admission of the evidence. Tenn. R. Evid. 103(a)(2). These requirements may be satisfied by presenting the actual testimony, by stipulating to the content of the excluded evidence, or by presenting an oral or written summary of the excluded evidence. Neil P. Cohen, et al. *Tennessee Law of Evidence* § 103.4, at 20 (3d ed. 1995). Since we are unable to determine the substance of Morris' testimony and whether that testimony would have affected the outcome of the trial, the failure of the defendant to make an offer of proof constitutes a waiver of the right to challenge the exclusion of this testimony. *Hatton v. CSX Transportation, Inc.*, 2004 Tenn App LEXIS 412, Tenn. App. No. E2003-01831-COA-R3-CV, 2004 WL 1459391 (Tenn. Ct. App. June 29, 2004).

The next issue raised by the appellant is whether the trial court erred by failing to excuse a juror, Ruth Faulkner, when it was discovered following completion of jury selection that her brother was formerly married to one of the witnesses for the plaintiff, Kristina Barrett. Ms. Faulkner had not responded when counsel for plaintiff asked if any prospective juror knew this witness. After jury selection was completed, another of plaintiff's witnesses saw Ms. Barrett speak to Ms. Faulkner and brought it to the attention of one of the attorneys who, in turn, brought it to the attention of the court. Mrs. Faulkner was individually *voir dired* by the court. During this process it was determined that Kristina Barrett was the former wife of Ms. Faulkner's brother. She knew her, however, as "Kristine" Barrett. Ms. Faulkner had not seen Kristina Barrett for about three years and stated to the court that her acquaintance with Ms. Barrett would not affect her decision in the case. She further stated that she could be fair to both parties.

Since the jury selection process had been completed, the trial court, in our opinion, would only have been justified in excusing this juror if there was a valid excuse for cause. The statutes relating to the eligibility for jury service are found in Tennessee Code Annotated sections 22-1-101 through 22-1-105. Tennessee Code Annotated section 22-1-101 contains the basic age and residency requirements. Section 22-1-102 provides for the exclusion of persons convicted of theft or infamous crimes, persons of unsound mind, habitual drunkards and persons with seeing or hearing difficulties that would prevent them from performing service as a juror. Section 22-1-103 provides for

occupational and disability exemptions. Section 22-1-104 provides for excusing jurors where their health or the health of a member of their family requires their presence elsewhere, where their service would constitute an undue hardship and where the prospective juror is over 70 years of age. Section 22-1-105 is entitled "Disqualification by interest or relationship." and provides:

> No person can act as a juror in any case in which the person is interested, or when either of the parties is connected with the person by affinity or consanguinity, within the sixth degree, computing by the civil law, except by consent of all the parties.

Consanguinity refers to a relationship by blood or a common ancestor. Affinity refers to a relationship by marriage. It has long been held that a relationship by affinity is dissolved by dissolution of the marriage by which the relationship was created. *Wilson v. State*, 100 Tenn. 596, 46 S.W. 451 (1898); *Goodall v. Thurman*, 38 Tenn. 209 (1858). Thus, even if Kristina Barrett had been a party to the lawsuit, Ms. Faulkner would not have been precluded from serving as a juror by this statute.

> Section 22-1-106 provides:

> Discharge of unqualified jurors. The court may discharge from service a grand or petit juror who does not possess the requisite qualifications, or who is exempt or disqualified from such service, or for any other reasonable or proper cause, to be judged by the court. That a state of mind exists on the juror's part toward law enforcement or which will prevent the juror from acting impartially shall constitute such cause.

Under this statute, disqualification is to be judged by the court. Whether the juror has such a "state of mind" which will prevent that juror from acting impartially is thus committed to the discretion of the court. The trial court's finding of bias or lack of bias of a juror is accorded a presumption of correctness, and the appellant must establish by convincing evidence that the trial court's determination was erroneous before an appellate court will overturn that decision. *State v. Alley*, 776 S.W.2d 506 (Tenn. 1989).

Applying that standard to the trial judge's ruling with respect to Ms. Faulkner, we conclude that appellant has failed to establish by convincing evidence that the court's action was erroneous. Juror Faulkner stated she could be fair to both sides and the fact she knew a witness would not cause her to favor one side or the other. We find this issue to be without merit.

Appellant next alleges that the trial court misconstrued its role as thirteenth juror. This issue is grounded on the following statement of the trial court when ruling on the motion for new trial:

> THE COURT: Looking further then at the motion for new trial and combination of issues, I suppose it's probably a fair statement to say that there is never a perfectly tried trial. There is never a trial, particularly one of the length that this one was, with the magnitude of issues, witnesses, questions of fact and issues of law, that there's not some error therein. As we look back on the proof though that was presented and the total conduct in the trial, we don't see

an issue or combination of issues that would justify us in finding that a new trial should be granted.

When a trial court is called upon to act as a thirteenth juror following the filing of a motion for a new trial, the trial court must be independently satisfied with the verdict of the jury. *Cumberland Telephone & Telegraph Co. v. Smithwick*, 112 Tenn. 463, 79 S.W. 803 (1904); *Holden v. Rannick*, 682 S.W.2d 903 (Tenn. 1984); *Ridings v. Norfolk Southern Railway Co.*, 894 S.W.2d 281 (Tenn. Ct. App. 1994). In performing this function, the trial court must itself weigh the evidence heard by the jury. If after weighing the evidence, the trial court is satisfied with the verdict, it is the trial court's responsibility to approve the verdict. If, after weighing the evidence, the trial court is not satisfied with the verdict, it must grant a new trial. In performing its function as thirteenth juror, the trial court acts as a jury unto itself in evaluating and weighing the evidence presented and may not simply defer to the result reached by the jury. *Ridings* at 288-89.

When the trial judge approves a verdict without comment, it is presumed by an appellate court that he or she has performed his or her function adequately. *Miller v. Doe*, 873 S.W.2d 346 (Tenn. App. 1993); *James E. Strates Shows, Inc. v. Jakobik*, 554 S.W.2d 613, 615 (Tenn. 1977). Where the trial court makes comments on the record in the course of reviewing a motion for a new trial, we will review those comments to determine whether the trial court properly reviewed the evidence, and was satisfied or dissatisfied with the verdict. If the trial court's comments indicate that it has misconstrued its duty as thirteenth juror, and has approved the verdict for some reason other than its own satisfaction with the verdict based upon an independent evaluation of the evidence, it is our responsibility to reverse and remand the case for a new trial. *Dickey v. McCord*, 63 S.W.3d 714 (Tenn. Ct. App. 2001); *Miller* at 347; *Nelson v. Richardson*, 626 S.W.2d 702, 704 (Tenn. Ct. App. 1981).

We disagree that the trial court's comments indicate it misconstrued its role as thirteenth juror. The comments made in this case must be evaluated in light of the grounds raised in the motion for a new trial. In the Appellant's motion for new trial, it raised the same two grounds raised here, the exclusion of the testimony of Howard "Butch" Morris and the trial court's refusal to excuse Juror Faulkner. The third issue raised was that the verdict was contrary to the evidence and not supported by the evidence adduced at trial. Finally, there were three grounds relating to the size of the verdict. When the trial court stated, "[a]s we look back on the proof though that was presented," it clearly indicated it had reviewed and evaluated the evidence presented at trial. Then the court added, "we don't see an issue or combination of issues that would justify us in finding that a new trial should be granted." We interpret this phrase to mean that the court agreed with the verdict, the third ground raised, and, in fact, the evidence was strong enough that the outcome would not have been affected by one or both of the first two alleged errors, if found to be error.

Moreover, the trial court went on to state, prior to ruling on the final three issues relating to the size of the verdict,

-11-

> THE COURT: Separately and independently, we have examined as the thirteenth juror, the issues of the Remittitur which is before us.

This statement not only indicates that the court performed its function as thirteenth juror on the issue of liability but also did so on the issue of whether the verdict was excessive. Because the court disagreed with the amount of the verdict the jury had returned, a remittitur was granted. We are satisfied the statements made by the trial court not only fail to show the trial court misconstrued its function as thirteenth juror as alleged by the appellant, but affirmatively indicate the trial court independently evaluated the evidence and approved the portion of the verdict it agreed with and disapproved the portion of the verdict with which it had disagreement.

Finally, appellant asserts the trial court's remittitur of the verdict for compensatory damages for humiliation and embarrassment was insufficient and contrary to the preponderance of the evidence. The jury awarded Lt. Thompson $450,000.00 for the humiliation and embarrassment suffered by him. The trial court granted a remittitur of $150,000.00 and approved a judgment of $300,000.00 for this element of damages. Because we believe there is material evidence to support a verdict in that amount, we find no error in the amount of the judgment for humiliation and embarrassment approved by the trial court.

We begin our examination of this issue by determining the appropriate standard of review. Rule 13(d), Tenn. R. App. P., provides:

> Findings of Fact in Civil Actions. Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.

The jury found, as a fact, Lt. Thompson had been damaged in the amount of $450,000.00. The trial court, as thirteenth juror, reduced that amount to $300.000.00. As stated above, the trial judge has the duty and authority to independently weigh the evidence and change the verdict if he or she disagrees with it. This court does not have that authority in accordance with the cited rule. Thus, if there is material evidence to support the verdict in the amount approved by the trial court, we must affirm. *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980).

The best description of the effect the transfer of Lt. Thompson to the midnight patrol shift had on him was given by his wife, Ann Thompson. Prior to the events that led up to the transfer, she described her husband as being excited about his job. According to Mrs. Thompson, he related well to other officers and was trusted by them. In the summer of 2000, beginning with his reporting the situation relating to Lisa Lewis to Don Pickard, the City Administrator, and his later confrontation with Chief Morris, he became very frustrated at not being able to perform his duties. At home he became short tempered and appeared preoccupied. He was very disappointed about his transfer. The family's lifestyle changed because he was required to sleep during the day and family activities had to be planned at night. He was unable to attend the children's activities, swim meets, football games

and similar events because of his working the midnight shift. He had been a member of the Cursillo at church and a Fourth Degree Knight with the Knights of Columbus but no longer attended those meetings. His personality changed in that he became more withdrawn, irritable and spent a lot of time sleeping or trying to sleep. He frequently exhibited despair and loss of faith concerning his job and his leaders. He felt it difficult to put on a uniform and a badge and swear to protect and serve the public when he could not protect his own co-workers or himself from being a victim.

The changes in Lt. Thompson's life must also be considered in the context of his circumstances before and after the transfer. According to the evidence presented, prior to March 2001, Lt. Thompson was highly respected by other officers in the LaVergne Police Department and was trusted by them. They sought him out to report problems within the department or within their own lives. Virtually all the incidents testified to during the trial were first reported to Lt. Thompson on an informal basis. Lt. Thompson felt that when other officers reported problems to him, they expected him to take appropriate action to resolve those problems.

While Lt. Thompson maintained his rank as a lieutenant, every officer who testified considered the transfer a demotion. Lt. Thompson filed suit in May 2001 outlining his theory of why the transfer had occurred. No corrective action was taken. To the contrary, fellow officers whose names were mentioned in the suit were told they were being sued. Lt. Thompson felt he was being shunned by other officers. He believed his opportunity for advancement within the police department had become permanently damaged. In November and December 2001, Chief Morris and Lisa Lewis ceased being employees of the City of LaVergne. No one came forward, however, and suggested the transfer be re-examined. Instead, his replacement as lieutenant in charge of C.I.D., Lt. Steven Lindsay, was elevated to the Chief of Police and C.I.D. was left to be supervised by a sergeant. That situation continued and Lt. Thompson remained assigned to the midnight patrol shift until the trial of this case began on July 1, 2003.

The reason all of this occurred, as found by the jury, was that Lt. Thompson was investigating what he thought was the sexual harassment of Chris Goins by Lisa Lewis and his attempts to get someone to take some action on account of the information he had assembled. He was attempting to perform what he felt was his duty to achieve a resolution to a problem he believed to be plaguing the police department. As the learned trial judge instructed the jury in this case:

> It is the law of this state that employees must be able to oppose discriminatory practices, make a charge of discrimination, file a complaint of discrimination, or testify or assist or participate in any manner in any investigation, proceeding or hearing of discrimination or sexual harassment pursuant to the Tennessee Human Rights Act without fear or reprisal or penalty from an employer.

It is apparent the jury felt Lt. Thompson suffered embarrassment and humiliation as a result of actions taken against him for performing his duty. He could have ignored the situation, maintained the code of silence, and none of the described events would have occurred. He did what citizens desire from their public servants. He pursued a problem affecting the operation of the police department. The City of LaVergne compounded the problem by taking no corrective action during

the more than two years the lawsuit was pending. Obviously, the jury thought he ought to be compensated well for any humiliation and embarrassment he suffered as a result. There is material evidence to support the jury's determination. This court has frequently said that damages for humiliation and embarrassment in Human Rights Act cases is peculiarly within the province of the jury subject to the rule of reasonableness. *Forbes v. Wilson County*, 1998 Tenn. App. LEXIS 340, No. 01A01-9602-CH-00089 (Tenn. Ct. App. May 20, 1998); *McDowell v. Shoffner Indus. of Tenn., Inc.,* 1993 Tenn. Ct. App. LEXIS 472, No. 03 A01-9301-CH-00030, 1993 WL 262846 (Tenn. App. July 13, 1993). That statement of the law is particularly applicable to this case for the reasons stated. We find there is material evidence to support the jury's award, as approved by the trial judge, and do not find it unreasonably excessive.

Finding no reversible error, the judgment of the trial court is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary including determination of an award of attorney's fees on appeal.

_____
DONALD P. HARRIS, SENIOR JUDGE