NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0009n.06
Filed: January 4, 2006

No. 04-6317

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOHN H. BARNES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BRADLEY COUNTY MEMORIAL | ) | EASTERN DISTRICT OF TENNESSEE |
| HOSPITAL, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE:    CLAY and GIBBONS, Circuit Judges; and STEEH, District Judge*

    **George Caram Steeh, District Judge.**  Plaintiff, John H. Barnes, brought suit against

defendant Bradley County Memorial Hospital arising out of its refusal to pay him severance as

provided by his employment agreement if terminated "without Cause."  The district court

granted summary judgment to Defendant, finding against plaintiff on claims of breach of

contract, constructive discharge and negligent and intentional misrepresentation.  Plaintiff

appeals from the district court's decision.  Because we conclude that plaintiff resigned from his

employment under circumstances which did not require payment of severance benefits by the

terms of his agreement, this Court affirms the district court's grant of summary judgment in

favor of Defendant.

_____

    *The Honorable George Caram Steeh, United States District Court Judge for the Eastern
District of Michigan, sitting by designation.

## I. BACKGROUND

### A. Substantive Facts

John H. Barnes became the Interim Administrator of Bradley County Memorial Hospital ("BCMH") in January, 2000. BCMH is a Tennessee governmental entity which conducts its business through a Board of Trustees (the "Board"). On September 1, 2000, Barnes and BCMH entered into a formal Employment Agreement ("Agreement") which provided that Barnes was to report to the Board in his capacity as Administrator. Under the Agreement, Barnes became entitled to the payment of severance (one year's salary, benefits and commissions) if terminated by BCMH "without Cause" or if he resigned "with Good Reason."[1]

In early March 2003, Barnes was contacted about meeting with some physicians from the Galen Group, a medical practice consisting mainly of primary care physicians serving BCMH. Acting on the authority of the Board, Barnes had taken a number of actions that were highly unpopular with various members of the local medical community. At the meeting, Barnes was confronted by a number of physicians who were angry about the Board's decision to establish an alternative group of primary care physicians and provide them offices in the hospital's medical

---

[1]"Cause" is defined in the Agreement as: (i) the conviction of Employee for any crime . . . ; (ii) any willful or intentional act of Employee committed for the purpose of materially harming Employer's business or reputation; (iii) improperly or unlawfully converting for Employee's own personal benefit any material property of Employer; (iv) chronic alcoholism . . . ; (v) substandard evaluation in Employee's annual performance review . . . ; or (vi) Employee has committed a material breach of this Agreement. (Agreement, Section 4(b))

"Good Reason" is defined in the Agreement as: (i) the failure by Employer to provide compensation, exclusive of bonus, and benefits to Employee in amounts equal to or better than those provided as of the first day of employment hereunder; (ii) the assignment by Employer to Employee of any duties that are materially inconsistent with respect to Employee's position and duties as are in effect as the first date of employment hereunder, or (iii) any other material breach of this Agreement by Employer. . . . (Agreement, Section 4(d))

building. The physicians threatened to "run [Barnes] out of town."

The physicians next called a meeting at the offices of the Galen Group, and requested the attendance of Herbert Lackey, Chairman of the Board of Trustees, and Dr. John M. Powell, its Secretary. The meeting was characterized by complaints that morale at the hospital was at "an all time low." The day after the meeting, Lackey and Powell met with Barnes "to bring him up to speed as to what people were saying about the hospital and about the administration of the hospital."

Dr. Jack Byrd, Chief of the Medical Staff, called a special meeting of physicians on the medical staff on April 10, 2003. Before the meeting, Byrd met with Barnes to advise him about the severity of the situation. After the meeting, Dr. John Chambers, a member of Barnes' administrative staff and the hospital's medical staff, reported to Barnes that the meeting was characterized by "a lot of anger." It is unclear whether a formal vote of "no confidence" in Barnes' administration took place, but after the meeting, Byrd talked to each Board member and advised the members of the medical staff's "feeling [of] no-confidence in the administration."

On April 18, 2003, the Board met to consider and approve the hospital's liability insurance. After the Board resolved the insurance question, Barnes and his staff, believing the meeting to be over, left the room. A few minutes after leaving the meeting, Barnes learned that the new insurance had been bound. Barnes entered the meeting room and found the Board members down at one end of the table. Barnes told the Board they had bound coverage and then left the room. The meeting broke up about forty-five minutes later without anybody saying anything to Barnes. This was the only time the Board had met without Barnes since he became Administrator.

On April 21, 2003, Chairman Lackey contacted Barnes' assistant Ken Tustin to schedule a meeting with Barnes to be held on April 23, 2003. Lackey did not tell Tustin the subject of the

3

meeting. It was very unusual for Lackey to call Tustin instead of calling Barnes directly. In the context of the events described above, Barnes determined that the Board was going to ask for his resignation. On April 22, 2003, Barnes drafted a letter of resignation in case it was requested at the next day's meeting.

Unbeknownst to Barnes, at the private "conversation" of the Board which took place after the insurance issue had been resolved, one of the Board members called Lackey's attention to the fact that Barnes had a written Employment Agreement that contained a severance clause. Prior to meeting with Barnes on April 23, 2003, Lackey met with the Board's attorney regarding the Employment Agreement.

Lackey and Powell met with Barnes on April 23, 2003. Barnes' description of the meeting is that Lackey and Powell entered his office without any of their customary warmth or familiarity. Lackey made various statements such as: "this is the most difficult thing I've ever had to do"; "I've never had to do anything like this before"; and "[t]his is so onerous to me that I haven't been able to sleep for three nights." Lackey also told Barnes that he had gone to the Board attorney two days before "to see if I could resign from the Board rather than doing what I have to do." Lackey said the Board attorney "told me I could not resign, but I had to carry out the desires of the Board." Lackey then said, "[o]ne reason why this is so hard is because I like you so much." Barnes felt he was faced with words which had only one logical meaning, and he produced his letter of resignation. Lackey and Powell accepted Barnes' letter without objection or question, and without any indication of surprise. Lackey told Barnes that "this" was not the unanimous decision of the Board, but it was "a majority decision." Lackey and Powell asked Barnes to work through June 30, 2003. Barnes declined, stating, "Hey, I'm going to get on with life. I'm going fishing tomorrow."

4

About a month after turning in his resignation, on May 27, 2003, having not heard anything about severance benefits, Barnes sent a letter to the Board setting forth the reasons for his resignation. The letter provided, in part:

> I resigned for no other reason than to give the board maximum flexibility in dealing with the criticism and pressures they were receiving, and only after I had been led to believe that a majority of the members believed my resignation would be in the best interest of the hospital. I resigned so that all who must continue would be able "to blame it on the previous administration", even though they had direct involvement and had pre-approved my actions. There is no other reason I would have left a job that I have thoroughly enjoyed these last three and a half years.

## B. Procedural History

On August 5, 2003, Barnes filed his complaint, based on diversity jurisdiction, alleging that he was forced to leave his position at BCMH, and was therefore entitled to severance benefits of $250,000.00 under the Employment Agreement. Barnes also sought an award of pre-judgment interest, compensatory damages for negligent and intentional misrepresentation, punitive damages, costs and attorney fees. Defendant filed a motion for summary judgment which the district court granted on September 24, 2004. Plaintiff filed his notice of appeal to this Court on October 22, 2004.

## II. ANALYSIS

### A. Standard of Review

The Court reviews a district court order granting a Rule 56(c) motion for summary judgment *de novo*. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001).

### B. Whether the District Court Properly Determined That Barnes Was Not Entitled to Severance Pay Under His Employment Agreement

Under Tennessee law, clear and unambiguous contracts must be enforced as written. *See, e.g., Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 494 (Tenn. Ct. App. 2003). There is no

dispute that the Agreement in this case is clear and unambiguous. Therefore, parol evidence relative to the "meaning" of the Agreement is inadmissible and interpretation of the Agreement is a question of law for the Court. *Security Fire Protection Co., Inc. v. Huddleston*, 138 S.W.3d 829, 834, 836 (Tenn. Ct. App. 2003).

The provision of the Agreement under which Barnes claims he was terminated provides:

> Termination by Employer Without Cause. Employment may be terminated by Employer without Cause by giving to Employee notice of termination without Cause. The termination date shall be a date set forth in the notice, which date shall not be less than thirty (30) days from the date such notice is received by Employee.

(Employment Agreement, Section 4(c)). Under Section 10(a) of the Agreement, such notice "shall be in writing." Clearly in this case there was no written notice of termination from BCMH's Board.

In its opinion granting summary judgment to defendant, the district court noted that Barnes "has produced no evidence that any member of the Board of Trustees ever gave him a writing that informed him he was being terminated, informed him he would be terminated if he did not resign, asked for his resignation, or even suggested that he resign because he had lost the support of the Board of Trustees." (Opinion, pg. 18). The only notice of termination in the record is Barnes' notice that he was resigning. Neither that notice, nor his subsequent letter, suggests that Barnes was asked to resign.

Barnes contends that the written notice provision is intended to be a protection to the recipient, not a protection to the one attempting to give notice. However, because the contract is unambiguous, the Court must interpret it as written and may not speculate as to the intent of the parties. *Atlantic Pools & Spas, Inc.*, 64 F. Supp. 2d 708, 714 (M.D. Tenn. 1999).

Barnes also cites to cases for the proposition that Tennessee courts have refused to enforce a technical written notice requirement when it is obvious that there was actual notice, and a lack of

6

written notice did not prejudice a party's rights. *See Wilson v. Hudson's Lessee*, 16 Tenn. 398, 410 (1835); *Union Planters Corp. v. Harwell*, 578 S.W.2d 87, 90 (Tenn. Ct. App. 1978); *Davis v. Aetna Ins. Co.*, 65 S.W.2d 235, 237-38 (Tenn. Ct. App. 1932). However, in the cases cited by Barnes, the defendants had received actual notice.

Barnes contends that under the Agreement, "either party can waive" the notice provision, and he chose to waive the formality of written notice in the case of the Board requesting his resignation. In Tennessee, a "waiver of a legal right must be evidenced by a clear, unequivocal and decisive act of the party showing such a purpose." *Stovall of Chattanooga, Inc. v. Cunningham*, 890 S.W.2d 442, 444 (Tenn. Ct. App. 1994). Barnes suggests that the parties waived the written notice requirements in Section 10(b) of the Agreement because they regularly ignored the obligation to provide written notices. As support for this assertion, Barnes testified that he and Lackey had a casual relationship and typically conferred without prior written notice of a meeting. However, the Agreement does not state that written notice of meetings must be given. The written notice provision applies to notices made "in connection with this Agreement," not to other aspects of the employment relationship unrelated to the terms of the Agreement. There does not appear to be any other instances in which a notice connected with the Agreement was not conveyed in writing. Furthermore, the Agreement provides that no prior waiver of any provision "shall constitute or evidence a waiver by such party of any other provision or other part of such provision or of the same provision or part at any other time." (Agreement Section 10(d))

In this case, there is no evidence that any member of the BCMH Board gave plaintiff written or verbal notice: (1) that he was being terminated; (2) that he would be terminated if he did not resign; (3) asking for his resignation; or (4) suggesting that his resignation would be in the best

interests of the hospital.

Nowhere in Barnes' resignation letter or his May 27, 2003 letter seeking severance benefits did Barnes suggest he was terminated or forced to resign. In the May 27, 2003 letter he stated that he was accusing "no one of improper administration of [the] agreement." He further states that he "resigned after Herb Lackey and Bo Powell informed me that the Board needed to be responsive to the members of the medical staff who had expressed dissatisfaction with me personally under the direction of the hospital." The strongest statement was that, "I resigned for no other reason other than to give the board maximum flexibility in dealing with the criticism and pressures they were receiving, and only after I had been led to believe that a majority of the members believed my resignation would be in the best interest of the hospital." Barnes swore under oath that the two letters accurately convey the reasons for which he left BCMH.

The Board never gave Barnes a written notice of termination or any actual notice that he was being terminated. Accordingly, we find that the district court correctly determined that Barnes was not entitled to severance pay under his employment agreement.

**C.    Whether the District Court Properly Concluded That Barnes Was Not Constructively Terminated**

Barnes argues that a reasonable jury could conclude that the events preceding his resignation show that the Board intended to remove him from his position. Barnes states that the district court failed to consider the fact that management-level employees are rarely fired or terminated; instead management seeks their resignation. Barnes describes the situation he faced as a matter of connecting up the dots and argues that he reasonably concluded that the April 23, 2003 meeting between himself and members of the Board was arranged specifically to seek his resignation. Barnes concludes that he was constructively terminated, which qualifies as a termination without

8

Cause under Section 4(b) of the Agreement.

Barnes cites a case from the Colorado Court of Appeals to support his claim of constructive termination:

> The fact of discharge does not depend upon the use of formal words of firing. The test is whether sufficient words or actions by the employer "would logically lead a prudent person to believe his tenure had been terminated."

*Colorado Civil Rights Comm'n v. State School District No. 1*, 488 P.2d 83, 86 (Colo. Ct. App. 1971). However, the supervisor in that case affirmatively advised the claimant "that he would not recommend her for employment during the next year and suggested that she resign." *Id*. at 84-85.

There are more relevant cases from Tennessee from which to seek guidance. In *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 94 (Tenn. 1999), plaintiff entered into a contract to serve as defendant's marketing director. Thereafter, defendant demoted plaintiff, required him to work at home, deprived him of the authority to bind the corporation, reclaimed his company credit cards and refused to answer telephone calls for him. The Tennessee Supreme Court concluded that the evidence established that defendant "effectively terminated [the plaintiff's] employment without cause, thereby breaching the contract." *Id*. at 94.

In *Walker v. City of Cookeville*, 2003 WL 21918625, *1 (Tenn. Ct. App. Aug. 12, 2003), plaintiff entered into an agreement with defendant to serve as its Interim Assistant Administrator and Director of Quality Management. The agreement provided that plaintiff would be entitled to severance pay if defendant terminated her employment without cause, but not if she resigned. Defendant expressly notified plaintiff that it was removing her position and demoting her to a position with fewer responsibilities. *Id.* at *3. Plaintiff resigned and brought suit alleging that defendant's actions constituted a constructive discharge and, therefore, she was entitled to severance

9

pay under the agreement. *Id.*

The Tennessee Court of Appeals stated that "[t]he doctrine of constructive discharge recognizes that some resignations are coerced and that employers should not be permitted to escape liability because they forced an employee to resign." *Id.* at *7. The court recognized two varieties of constructive dismissal. The first is in the context of hostile work environment discrimination claims and is not relevant here. The second variety of constructive discharge involves the demotion of executive employees who have a position-specific contract. The court determined that, by forcing plaintiff to choose between demotion and resignation, defendant constructively terminated her employment:

> [W]hen an employee with a position-specific employment contract resigns after the employer forces the employee to choose among demotion, termination, or resignation, the employer remains liable for breach of contract unless the facts clearly demonstrate a fairl

*Id.*

Unlike the facts in *Walker*, there is no evidence that BCMH forced Barnes to make any choice or do anything against his will. Barnes was not deprived of his office or stripped of any of his job duties. Neither Lackey nor Powell exerted pressure on Barnes at the April 23, 2003 meeting, nor did they inform him that he had been terminated or was being asked to resign. Prior to April 23, 2003, no member of the Board ever advised Barnes that he would be terminated or asked to resign. Barnes' own statements in his letters are irreconcilable with any suggestion that he was coerced or forced to resign.

Barnes offers no explanation for not waiting to see what Lackey and Powell or the other Board members had to say. Nor is there any explanation for not attempting to negotiate a separation agreement before tendering his resignation. Perhaps the Board intended to terminate Barnes or

10

induce him to resign, but neither of these things actually happened prior to Barnes' tendering his resignation.  The district court properly concluded that Barnes was not constructively terminated.

**D.     Whether the District Court Properly Concluded BCMH Did Not Negligently Misrepresent its Intentions to Terminate Barnes or Seek His Resignation**

In his amended complaint, Barnes alleged that Lackey and Powell communicated to Barnes that they intended to terminate Barnes and if they did not intend to do so, then their actions constituted negligent or intentional misrepresentation.  Barnes only appeals from the district court's dismissal of his negligent misrepresentation claim.

Barnes' misrepresentation claim is barred by the Tennessee Governmental Tort Liability Act.  As a governmental entity, BCMH is immune from claims for injuries arising from "misrepresentation by an employee whether or not such is negligent or intentional."  Tenn. Code Ann. § 29-20-205(6).  Since Lackey and Powell are employees of BCMH, Barnes' tort claims fail as a matter of law.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.